## IMPRESA CONSTRUZIONI GEOM. DOMENICO GARUFI, Plaintiff–Appellant,

v.

## UNITED STATES, Defendant–Appellee.

### No. 99–5137.

United States Court of Appeals, Federal Circuit.

Jan. 3, 2001.

Sam Zalman Gdanski, of Suffern, New York, argued for plaintiff-appellant.

Franklin E. White, Jr., Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were David W. Ogden, Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief was Vicki E. O'Keefe, Attorney, Naval Facilities Engineering Command, Department of the Navy, of Washington, DC. Of counsel were Kenneth M. Dintzer, Trial Attorney; Michael Duclos, Trial Attorney; Jeanne E. Davidson, Deputy Director; and Katherine M. Kelly, Trial Attorney, Department of Justice, of Washington, DC.

Before NEWMAN, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents an issue that has not been fully addressed by this court-the standard for reviewing decisions of contracting officers under the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996). We hold that the appellant has standing to challenge the contracting officer's responsibility determination. Applying the standards of the ADRA, we find that a substantial question has been raised concerning the rationality of the contracting officer's responsibility determination. We therefore reverse and remand the case to the Court of Federal Claims to allow a limited deposition of the contracting officer concerning the basis for the responsibility determination so that the Court of Federal Claims can properly review the responsibility determination using the standards established by the ADRA. In other respects, we affirm.

I

This case involves a contract for maintenance, groundskeeping, janitorial, and other services, to be performed at the United States Naval Air Station in Sigonella, Italy. The appellant, Impresa Construzioni Geom. Domenico Garufi ("Garufi"), an unsuccessful bidder, challenged the award of the contract to Joint Venture Conserv ("JVC"). The background of this controversy is as follows:

On August 28, 1998, the Navy issued a Request for Proposals ("RFP") for the services contract at the Sigonella base. Four offerors responded to the solicitation, including Garufi and JVC. JVC is a joint venture composed of three companies: Lara Srl ("Lara"), Impredil Construzioni Srl ("Impredil"), and Coop. Bosco Etneo arl ("Bosco"). It appears that Lara and Impredil had previously performed similar contracts at the Sigonella base. Also, these two companies (Lara and Impredil), at

least previously, were controlled by Carmelo La Mastra, while Bosco was controlled by Carmelo La Mastra's brother-in-law, Alfio Bosco.

In a 1997 proceeding, an Italian court, the Court of Catania Third Penal Division, found that Carmelo La Mastra had engaged in bid rigging and was involved in a Mafia organization in connection with previous contracts at the Sigonella base, apparently in the early 1990's. The Italian court found that Carmelo had been involved in intimidating a competitor into withdrawing from a bid for a contract at the Sigonella base, and that "probably in connection with that [same] bid the owner of another firm ... was killed." The Italian proceeding was also directed against Salvatore La Mastra and Alfio Bosco, the son and brother-in-law of Carmelo La Mastra. The court found that the seizure of property levied against Carmelo "La Mastra's children" and Bosco "appears to be legitimate" in light of "the free availability of immovable properties and societies registered fictitiously under the name of people close to him" and that such past and future transfers of property "may facilitate the consummation of other similar crimes or may make worse the consequences of the crimes already consummated." As a result of these findings the Court of Catania, in December 1997, placed Lara, Impredil, and Bosco under a receivership run by a legal administrator. The receivership papers gave the legal administrator authority to perform "all the necessary or opportune lawful acts for the management and administration" of the companies.

Shortly thereafter, also in December 1997, Lara and Impredil, with the approval of the legal administrator, conferred signatory power on Salvatore La Mastra, Carmelo La Mastra's son, to negotiate contract changes and sign modifications for various contracts at the Sigonella base.

Furthermore, in May 1998, also after the receivership had been established, Impredil filed registration papers at the Chamber of Commerce, Industry, Handicraft and Agriculture of Catania specifically listing Carmelo La Mastra as a "Company Officer" with the title of "Technical Manager appointed on 25 Jan. 1998" and as a "company signatory" of Impredil. The term "Technical Manager" is not defined in the document nor does the document disclose the job description or amount of control that a technical manager has over the company.

In June 1998, Carmelo La Mastra was indicted by the Anti Mafia District Office in Catania for his involvement in a "Mafiatype association" and for involvement in bid-rigging at the Sigonella base. The record does not disclose the outcome of that proceeding.

All of the events described in the preceding four paragraphs occurred before the 1998 RFP involved here. The RFP for the Sigonella contract, issued on August 28, 1998, stated that the contract would be awarded to the offeror who submitted the proposal that represented the best value to the government. On September 15, 1998, Lara, Impredil, and Bosco formed JVC as a temporary joint venture for the purpose of making a joint bid in response to the RFP. Lara was named as the prime contractor (lead manager) of the joint venture in the September 15, 1998, papers. The joint venture was formed under the supervision of the legal administrator appointed by the Italian court in the December 1997 proceeding. On the same date, JVC filed papers granting the legal administrator "authority to represent and run the aforementioned joint venture with the fullest powers as needed in connection with such appointment, without any limitations or exceptions...." [1]

---

1. Although not directly relevant to the March 1999 decision of the contracting officer, we note that in April 1999, after the establishment of the receivership and the award of the contract involved here, JVC conferred author- ity upon Salvatore La Mastra "to negotiate contract changes and sign modifications" for current contracts at Sigonella, including the contract involved here.

Garufi and JVC submitted proposals, along with two other offerors. Despite the receivership proceeding and the 1998 indictment of Carmelo La Mastra, JVC certified in its proposal that during the three-year period preceding its offer, neither it nor its principals had been convicted or had a civil judgment against them for certain offenses including "commission of a fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public ... contract" and were not presently indicted for such offenses.

Upon initial evaluation by a technical board and a price board, one of the competitors was eliminated from the competitive range by the contracting officer, leaving appellant Garufi, JVC, and one other bidder. After issuance of several reports, and numerous letters and meetings between Garufi and the boards, Garufi revised its proposal. The contracting officer then eliminated Garufi from the competitive range "based on the determination of the [technical board] that its revised technical proposals was [sic] rated UNACCEPTABLE overall" and "that a complete rewrite would be required to make the [proposal] acceptable." Moreover, the contracting officer stated that it was concerned "that [Garufi] may either not fully understand the complete solicitation requirements or be placing itself at an increased performance risk by its proposed prices being 25% below the [government estimate]." The contracting officer also eliminated the other remaining bidder, leaving JVC as the sole remaining bidder in the competitive range.

Under the Federal Acquisition Regulation ("FAR") the contract could not be awarded to JVC unless JVC was found to

be "responsible," including a finding of "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104–1(d).[2] On March 5, 1999, the contracting officer signed a responsibility determination, noting that JVC had "a satisfactory record of performance, integrity, and business ethics" and is "otherwise qualified and eligible to receive an award under applicable laws and regulations." The contracting officer therefore awarded the contract to JVC on March 5, 1999.

Garufi filed several protests with the General Accounting Office ("GAO"), challenging the Navy's elimination of Garufi from the competitive range and the grant of the contract to JVC. The GAO issued a final decision on June 17, 1999, denying Garufi's protests.

On June 28, 1999, Garufi filed a bid protest suit in the United States Court of Federal Claims pursuant to 28 U.S.C. § 1491(b)(1), which grants the Court of Federal Claims jurisdiction over bid protest actions against the government. [3] Garufi sought, *inter alia*, to have the court determine: (1) that the contracting officer's decision to award the contract to JVC was arbitrary and capricious based on an allegedly improper evaluation and elimination of Garufi from the competitive range; and (2) that the contracting officer made an arbitrary and capricious responsibility determination with respect to JVC. Garufi raised two grounds for challenging the responsibility determination: (1) that JVC lacked the satisfactory record of integrity and business ethics required by the regulations due to the alleged involvement of Carmelo La Mastra; and (2) that JVC lied on the certification concerning debarment and civil and criminal proceedings. Garufi

**2.** We note that on December 20, 2000, amendments to the Federal Acquisition Regulation were issued, effective January 19, 2001. This case is, of course, governed by the preexisting regulations.

**3.** 28 U.S.C. § 1491(b)(1) grants that "[b]oth the United States Court of Federal Claims and the district courts of the United States shall

have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."

asked the court to direct the agency to reevaluate both Garufi and JVC, or alternately, to make the award to Garufi.

During the Court of Federal Claims' proceedings, Garufi filed several motions for discovery, requesting information concerning the contracting officer's responsibility determination, and specifically requesting a deposition of the contracting officer. The government objected, and the Court of Federal Claims denied Garufi's request.

Garufi and the government then filed cross-motions for summary judgment. On July 30, 1999, the Court of Federal Claims denied Garufi's motion for summary judgment and granted the government's cross-motion. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 44 Fed.Cl. 540 (1999).

In its decision, the Court of Federal Claims determined that the elimination of Garufi from the competitive range was within the sound discretion of the contracting officer. *Id.* at 554–55. Having determined that Garufi had been properly excluded from the competitive range, the court then determined that Garufi lacked standing to challenge the award to JVC because Garufi was not an "interested party," i.e., because Garufi would not have been in a position to receive the award if JVC had been disqualified. *See id.* at 552 n. 8.

Nonetheless reaching the merits, the court rejected the challenge to the responsibility determination. The court noted that under the FAR, the contracting officer's signing of a contract constitutes a determination that the contractor is responsible (48 C.F.R. § 9.105–2(a)(1)) and that the contracting officer had also specifically found that JVC was responsible. *Id.* at 555. The court noted that there were "no allegations of fraud or bad faith on the part of the contracting officer." *Id.* at 556 (citing *Trilon Educ. Corp. v. United States*, 217 Ct.Cl. 266, 578 F.2d 1356 (Ct. Cl.1978)). In the absence of fraud or bad faith, the court apparently concluded that it should limit its review to the documentary record before the contracting officer. The government urged that the existence of the receivership made it reasonable to ignore the earlier misconduct of Carmelo La Mastra and his family. The court agreed, stating that it "cannot find on this record that the government's failure to find JVC non-responsible amounted to arbitrary and capricious action," and that "[t]he determination of responsibility appears instead to be consistent with the information developed in the procurement process." *Id.* Although the court agreed that "[t]he available records do not explain the relationship between the Italian court-appointed legal administrators and a signatory agent," the position held by Carmelo La Mastra's son, it concluded that "[n]either the court nor the CO are required to conclude on this record that acting as a signatory agent constitutes ownership." *Id.* Finally, the court reviewed "whether JVC's Certifications were consistent with the information available to the contracting officer," and concluded that "[o]n examination of the record, the court finds nothing which required a determination that facts available to the Navy conflicted with representations filed by the awardee." *Id.*

Based on all of this, the court held that the responsibility determination was not arbitrary and capricious. Garufi appealed.

## II

The Court of Federal Claims has jurisdiction to review post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b) (1994), as amended by the Administrative Dispute Resolution Act of 1996. The Court of Appeals for the Federal Circuit has jurisdiction over an appeal from the Court of Federal Claims under 28 U.S.C. § 1295(a)(3). We review *de novo* the grant or denial of motions for summary judgment. *B & G Enters., Ltd. v. United States*, 220 F.3d 1318, 1322 (Fed.Cir.2000); *Music Square Church v. United States*, 218 F.3d 1367, 1369 (Fed.Cir.2000).

## III

The history of the judicial review of government contracting procurement decisions is both long and complicated. In *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), the Supreme Court held that private parties lacked standing to challenge a government contract award for violation of procurement law, concluding that Congress enacted procurement laws for the protection of the government, rather than for those contracting with the government. *Id.* at 126, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. The Supreme Court also expressed reluctance to subject the purchasing agencies of the government to the delays associated with judicial review of government procurement decisions. *See id.* at 130–31, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. After *Lukens Steel*, it was generally assumed that disappointed bidders lacked standing to complain of government procurement decisions.

However, following the 1946 enactment of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, the District of Columbia Circuit in 1970 in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), held that in the APA Congress had statutorily changed the rule of *Lukens Steel* and that APA review of the procurement decisions of government agencies and officials was available in district courts. Subsequent cases confirmed that the district courts have jurisdiction over bid protests under the APA. *See, e.g., Diebold v. United States*, 947 F.2d 787 (6th Cir.1991); *Ulstein Maritime, Ltd. v. United States*, 833 F.2d 1052, 1057 (1st Cir.1987). As a result, disappointed bidders could now challenge contract awards at the district courts for alleged violations of procurement laws or regulations, or for lack of rationality. *See Scanwell*, 424 F.2d at 876. These cases upholding district court APA review of pro-

curement decisions are commonly referred to as the *Scanwell* line of cases.

Bid protest cases were also brought in the Court of Federal Claims and its predecessor courts, but on a very different theory—that the government made an implied contract with prospective bidders to fairly assess their bids, and that the Court of Federal Claims had jurisdiction under the Tucker Act which granted jurisdiction to the Court of Federal Claims "to render judgment upon any claim against the United States founded ... upon any ... implied contract with the United States." 28 U.S.C. § 1491(a); *see Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir.1998) (discussing the pre 1996 application of the implied contract theory on bid protest jurisdiction); *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir.1983) (en banc). Under this theory, the standard of review was far narrower than district court review under the APA, and an aggrieved bidder was typically limited to monetary relief such as bid preparation costs. *See Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 492 F.2d 1200, 1203 (Ct.Cl.1974); *Finley v. United States*, 31 Fed.Cl. 704, 708 (1994). In *Keco*, the Court of Claims set out four criteria that were generally relevant to the determination of whether the government had breached its duty to consider all bids fairly and honestly under the implied contract theory. *Keco*, 492 F.2d at 1203. Among the factors cited in *Keco* were the "subjective bad faith on the part of the procuring officials, depriving a bidder of the fair and honest consideration of his proposal." *Id.*

In 1982, Congress enacted the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 133(a), 96 Stat. 25, 40, giving the Court of Federal Claims jurisdiction to grant declaratory and injunctive relief, the remedies most sought in bid protest actions.[4] However, soon after the 1982 Act, this court limited the Court of Federal

---

**4.** The Court of Federal Claims was previously called the United States Claims Court prior to enactment of the Federal Courts Administra-

tion Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516. For simplicity, we refer to it by its current name.

Claims' bid protest jurisdiction to "pre-award" cases, that is, cases brought before the contract is awarded. *See United States v. John C. Grimberg Co.*, 702 F.2d at 1372. Therefore, if the contract had already been awarded, a bid protest suit could only be brought in the district court.

This situation led to litigants being given the opportunity to select between the different district courts, as well as the Court of Federal Claims, in bringing their claims, and resulted in a general lack of uniformity in bid protest law. Some urged that "[p]roviding district courts with jurisdiction to hear bid protest claims has led to forum shopping and fragmentation of Government contract law" and that "[c]onsolidation of jurisdiction in the Court of Federal Claims is necessary to develop a uniform national law on bid protest issues and end the wasteful practice of shopping for the most hospitable forum." 142 Cong. Rec. S6156 (daily ed. June 12, 1996) (statement of Sen. Cohen).

IV

In 1996, Congress passed the ADRA, thereby clarifying the Court of Federal Claims' bid protest jurisdiction. *See* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–76. The ADRA provides that the Court of Federal Claims and district courts shall have concurrent jurisdiction over bid protest actions, and that the courts "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5" of the APA.[5] 28 U.S.C. § 1491(b)(1), (4). Pursuant to the ADRA, the district courts' jurisdiction over bid protests was to terminate on January 1, 2001, unless extended by Congress, and the Court of Federal Claims was to have

exclusive jurisdiction over bid protest actions. *See* ADRA § 12(d).

The legislative history of the ADRA confirms what is obvious on the face of the statute—that the new legislation "applies the Administrative Procedure Act standard of review previously applied by the district courts (5 U.S.C. § 706) to all procurement protest cases in the Court of Federal Claims." H.R. Conf. Rep. No. 104–841, at 10 (1996). Under the ADRA, all bid protest actions under the APA are now reviewed under the standards applied in the *Scanwell* line of cases. *See Ramcor Services Group, Inc., v. United States,* 185 F.3d 1286, 1290 (Fed.Cir.1999) (stating that "[t]he ADRA explicitly imports the APA standards of review into the Court of Federal Claims' review of agency decisions.").[6]

Under the APA standards that are applied in the *Scanwell* line of cases, a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. *See Kentron Hawaii, Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973); *Scheduled Airlines Traffic Offices, Inc., v. Dep't of Defense,* 87 F.3d 1356, 1361 (D.C.Cir.1996); *Elcon Enterprises, Inc. v. Washington Metropolitan Area Transit Auth.,* 977 F.2d 1472, 1478 (D.C.Cir.1992); *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971). When a challenge is brought on the first ground, the courts have recognized that contracting officers are "entitled to exercise discretion upon a broad range of issues confronting them" in the procurement process. *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994). Accordingly, the test for reviewing courts is to deter-

---

5. Section 706 provides that: "The reviewing court shall— ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be— .. (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (D) without observance of procedure required by law...." 5 U.S.C. § 706.

6. Although it has been argued that the implied contract theory survives the 1996 amendment, *see* Frederick W. Claybrook, Jr., *The Initial Experience of the Court of Federal Claims in Applying the Administrative Procedure Act in Bid Protest Actions Learning Lessons All Over Again,* 29 Pub. Cont. L.J. 1, 15–17 (1999), we need not decide this issue.

mine whether "the contracting agency provided a coherent and reasonable explanation of its exercise of discretion," *id.,* and the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.' " *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 456 (D.C.Cir.1994). When a challenge is brought on the second ground, the disappointed bidder must show "a clear and prejudicial violation of applicable statutes or regulations." *Kentron,* 480 F.2d at 1169; *Latecoere,* 19 F.3d at 1356.

■ What we have said so far is sufficient to dispose of the government's first argument, i.e., that "absent allegations of fraud or bad faith" by the contracting officer, the responsibility determination of the contracting officer is immune from judicial review. In this connection, the government relies primarily on our predecessor court's decisions in *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (Ct. Cl.1974) and *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356, 1358 (Ct.Cl.1978).[7] The government has seriously misread these cases, which impose no such limits. For example, as cited by the government, *Trilon* states that "[a]bsent allegations of fraud or bad faith, then, affirmative determinations of responsibility *generally* will not be overturned, and *ordinarily* protest in this regard will not even be entertained." *Trilon,* 578 F.2d at 1358 (emphasis added). In addition, *Keco* establishes that bad faith on the part of the procuring official is only one of several criteria which may trigger judicial review of a contracting officer's decision and an award of bid preparation costs. *See Keco,* 492 F.2d at 1203; *see also Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988). In any

event, cases such as *Keco* and *Trilon* are based on the implied contract theory of recovery and do not govern APA review of contracting officer decisions. As we have discussed above, the 1996 amendments to the Tucker Act require that we apply the APA standard of review which is not limited to fraud or bad faith by the contracting officer. The traditional APA standard adopted by the *Scanwell* line of cases allows for review of an agency's responsibility determination if there has been a violation of a statute or regulation, or alternatively, if the agency determination lacked a rational basis.

V

■ Using the standards of the 1996 statute and the APA, we next consider Garufi's challenges to the contracting officer's responsibility determination with respect to JVC. In addressing the responsibility determination, we must initially address the question of standing. The Court of Federal Claims, having rejected appellant's argument that the government was required to include it within the competitive range (a decision which we sustain in Part VIII below), held that appellant therefore lacked standing to challenge the award to JVC on grounds of lack of responsibility. On appeal the government has abandoned this argument and admits that appellant has standing to challenge the responsibility determination. That is clearly correct.

According to revised 28 U.S.C. § 1491(b)(1), bid protest suits may be brought by "an interested party." Section 1491(b), however, provides no definition of the term "interested party." It is unclear whether section 1491(b)(1) adopts the liberal APA standing requirement set forth in section 702 of the APA [8] or whether it

---

7. Other cases cited by the government include: *Data Test Corp.,* 54 Comp. Gen. 499, 1974 WL 8741 (1974); *Central Metal Prods., Inc.,* 54 Comp. Gen. 66, 1974 WL 8647 (1974); *YRT Servs. Corp. v. United States,* 28 Fed.Cl. 366, 394 (1993); *Vulcan Eng'g Co. v. United States,* 16 Cl.Ct. 84, 91 (1988); and *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985).

8. Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

adopts the more restrictive standard set forth in 31 U.S.C. § 3551(2) for GAO review of bid protests. Under the GAO standard, an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." 31 U.S.C. § 3551(2). A standard identical to the GAO standard appears in the Brooks Act. 40 U.S.C. § 759(h)(9)(B); *see United States v. International Business Machines Corp.*, 892 F.2d 1006, 1011 (Fed.Cir.1989). We need not resolve whether the 1996 amendments have liberalized the standing requirements by adopting the APA standard, as some recent Court of Federal Claims decisions have suggested, [9] because even under the more stringent GAO standard, Garufi has an "economic interest" in the outcome.

This case is unlike other cases where we have found that (1) a contractor that did not submit a proposal did not have an economic interest, *see, e.g., MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed.Cir.1989), (2) a bidder who withdrew from the procurement did not have an economic interest, *see, e.g., Fed. Data Corp. v. United States*, 911 F.2d 699 (Fed.Cir.1990), or (3) a bidder rated below second lacked the required "direct economic interest in the award of the contract," *see, e.g., United States v. International Business Machines Corp.*, 892 F.2d at 1010–12. In those cases, the bid protester had no economic interest in the outcome since, if the protest were successful, the award would go to another party. In this case, as the government has conceded at oral argument, if appellant's bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and appellant could compete for the con-

tract once again. Under these circumstances, the appellant has a "substantial chance" of receiving the award and an economic interest and has standing to challenge the award. *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999).

## VI

We turn now to Garufi's claim that the contracting officer's responsibility determination concerning JVC's "record of integrity and business ethics" violated the APA. Under the Federal Acquisition Regulation, "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." 48 C.F.R. § 9.103(b). In making the responsibility determination, the contracting officer must determine that the contractor has "a satisfactory record of integrity and business ethics." 48 C.F.R. § 9.104–1(d). Furthermore, "[i]n the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility." 48 C.F.R. § 9.103(b). FAR 9.105–2(b) requires that "[d]ocuments and reports supporting a determination of responsibility or nonresponsibility ... must be included in the contract file." However, the contracting officer is not required to explain the basis for his responsibility determination, and he has not done so here. Rather, the contracting officer signed the contract thereby making the required determination according to FAR 9.105–2(a) and in conclusory fashion determined that JVC had "a satisfactory record of performance, integrity, and business ethics."

■ Contracting officers are "generally given wide discretion" in making responsi-

---

9. For example, the Court of Federal Claims has recently stated that "the ADRA does not limit standing to parties who meet the definition of 'interested party' under [31 U.S.C. § 3551(2)]". *American Federation of Government Employees, AFL–CIO v. United States*, 46 Fed.Cl. 586, 595 (2000). In *AFL–CIO*, the Court of Federal Claims concluded that, in

addition to hearing claims from parties that meet the standards as defined in 31 U.S.C. § 3551(2), they "may also hear challenges to procurement award decisions brought by persons who would have had standing in federal district court under the APA to challenge that same procurement decision." *AFL–CIO*, 46 Fed.Cl. at 595.

bility determinations and in determining the amount of information that is required to make a responsibility determination. *John C. Grimberg Co. v. United States,* 185 F.3d 1297, 1303 (Fed.Cir.1999). But this discretion is not absolute.

Unfortunately, the regulations concerning responsibility determinations are cryptic, but this court in *Trilon,* 578 F.2d at 1360, and the Comptroller General have recognized that we may look to the more extensive debarment regulations for guidance, at least on questions related to the "integrity and business ethics" requirement. *See, e.g., Steptoe & Johnson,* Comp. Gen. Dec. B–166118, 1969 WL 4287, at *5 (Mar. 28, 1969); *Secretary of the Army,* 39 Comp. Gen. 868, 872, 1960 WL 1741 (1960).

In this case, Garufi alleges that the contracting officer's responsibility determination is arbitrary because JVC does not fulfill the "satisfactory record of integrity and business ethics" requirement of FAR 9.104–1(d). This is said to be so because of the alleged involvement of Carmelo La Mastra and his relatives in JVC, and the findings of the Italian court in 1997 that Carmelo La Mastra engaged in criminal activities with respect to earlier contracts at the Sigonella base.

■ Two relevant propositions are established by earlier cases and supported by the debarment regulations. First, past criminal activities by a corporate officer do not automatically establish that the bidder fails the responsibility requirement. *Trilon* involved a suit for damages against the government under the Tucker Act. The government defended on the ground that the contract was void *ab initio* because the president of the contractor's parent company had been criminally convicted of fraud in connection with government contracts, and that the contracting officer therefore lacked authority to find the contractor qualified. *Trilon,* 578 F.2d at 1359. The government urged that the conviction "irrefutably demonstrates a lack of requisite business integrity on the part of the plaintiff [a subsidiary company], preventing [the plaintiff] from qualifying as a re-

sponsible bidder." *Id.* The court rejected this argument, noting that such imputation was not mandatory under the regulations. *See id.* at 1361. The court stated that "even had the contracting officer been cognizant of [the president of the parent company's] criminal conviction, he would still not have been compelled to make a determination of nonresponsibility" and that "it would have been within the sound discretion of the contracting officer to choose not to impute this to the plaintiff." *Id.* The present debarment regulations, which are similar to those on which *Trilon* itself relied, are equally clear. According to the debarment regulations, "[t]he fraudulent, criminal, or other seriously improper conduct of any officer, director, shareholder, partner, employee, or other individual associated with a contractor *may* be imputed to the contractor when the conduct occurred in connection with the individual performance of duties for or on behalf of the contractor, or with the contractor's knowledge, approval, or acquiescence." 48 C.F.R. § 9.406–5(a) (emphasis added). Likewise, similar conduct of "one contractor participating in a joint venture or similar arrangement *may* be imputed to the other participating contractors." 48 C.F.R. § 9.406–5(c) (emphasis added). The regulations make clear that "the existence of a cause for debarment, however, does not necessarily require that the contractor be debarred," and directs the agency official to balance the seriousness of the contractor's actions against the "remedial measures or mitigating factors" before making any debarment decision. 48 C.F.R. § 9.406–1(a).

The government urges that similarly, past improper actions by the former principal owner and head of two of JVC's components does not mandate a finding of non-responsibility of JVC. In view of the seriousness of the offenses found by the Italian court to have been committed by Carmelo La Mastra and his relatives, his and his relatives' central past role in the companies comprising JVC, and the direct relationship between these offenses and

the predecessor government contracts at the Sigonella base, the government would be hard pressed to support a responsibility finding with respect to JVC save for the court-appointed Italian receivership. However, the debarment regulations specifically recognize that a "bona fide change in ownership or management" may result in a reduction in the scope or period of debarment, 48 C.F.R. § 9.406-4(c)(3), and the District of Columbia Circuit has similarly recognized that an effective receivership may make debarment inappropriate. *Robinson v. Cheney*, 876 F.2d 152, 160 (D.C.Cir.1989). The government here urges that the Italian receivership eliminated the control of Carmelo La Mastra and his relatives over JVC, making it appropriate to find JVC responsible.

■ This leads, however, to a second proposition: the creation of a receivership does not necessarily achieve a change in control or require a finding that the contractor in receivership is responsible.

Here the government points out that the administrator is empowered to "represent and run the joint venture without any limitations or exceptions." The government urges that Carmelo La Mastra and his relatives accordingly no longer control JVC, and therefore any misconduct by them should not be imputed to the company.

The appellant denies that the appointment of the legal administrator divested Carmelo La Mastra and his relatives of control over the company. Appellant notes that the record before the contracting officer showed that, after the appointment of the administrator, Carmelo's son Salvatore was given signatory power over the contracts previously held by Lara and Impredil at Sigonella, as well as the power to negotiate contract changes and modifications. The debarment regulations themselves recognize the relevance of family connections. 48 C.F.R. § 9.403. Furthermore, Carmelo himself was appointed technical manager of Impredil, one of the component companies of JVC, and was listed as a company signatory of Impredil.

The appellant relies on *Robinson*, 876 F.2d at 160–61, for the proposition that the appointment of a receivership, by itself, is not necessarily sufficient to establish a company's present responsibility and cleanse the company of the consequences of past improper conduct. In *Robinson*, the owner of a military clothing supply company, fearing debarment for bribing government officials, transferred his company to a trust (naming himself as beneficiary) in order to avoid his company being debarred by the government for his past actions, which allegedly included bid rigging. Despite the trust arrangement, the government initiated debarment proceedings against the supply company "based upon 'information ... indicating that [the supply company] lacks the business integrity and present responsibility to be a Government contractor.' " *Id.* at 155. The government then debarred the company, finding that the existence of the trust agreement failed to adequately screen the company from the former owner's (and now beneficiary's) acts of bid rigging, and that his actions therefore affected the company's responsibility. *See id.* at 157. The trustee challenged the debarment proceedings and the findings of non-responsibility in light of the trust agreement.

The court in *Robinson* sustained the debarment. The court acknowledged that the "ultimate inquiry as to 'present responsibility' relates directly to the contractor itself, not to the agent or former agent personally responsible for its past misdeeds. Thus, the contractor can meet the test of present responsibility by demonstrating that it has taken steps to ensure that the wrongful acts will not recur." *Id.* at 160. Although the trust agreement in *Robinson* gave ultimate decision-making authority to someone other than the wrongdoer, who was accused of bid rigging, the court nevertheless held that the trust agreement on its face was not sufficient to assure that the wrongdoer would "not continue to act improperly in [the company's] interest." *See id.* at 161. Particularly important was the absence in the

trust agreement of specific terms barring the wrongdoer from acting on behalf of the company or participating in its management. *See id.* at 160. Furthermore, "nothing in either the trust agreement or in any other submission by the company gave the Government any assurance that [the wrongdoer] would not conduct illicit dealing on behalf of [the company] entirely outside company channels." *Id.*

This case is similar to *Robinson* in that the receivership agreement does not specifically bar Carmelo La Mastra from acting on behalf of or participating in the management of JVC. Indeed, as previously discussed, official papers filed by Impredil specifically list Carmelo La Mastra as a "technical manager" with signatory authority. It is noticeably unclear from the record what type of control or influence a "technical manager" has over a company. Furthermore, the record shows that prior to the award Carmelo La Mastra's son Salvatore La Mastra was given signatory authority to act on behalf of Impredil and Lara.

If this were a debarment proceeding involving government debarment of JVC, where the burden rests on the debarred company to show that it has taken steps to ensure that the wrongful acts will not recur, *see id.* at 160, we would follow *Robinson* and hold that the record does not establish the effectiveness of the receivership to insulate Carmelo La Mastra from control of JVC. But this is not a debarment proceeding, and the burden of establishing arbitrary and capricious action rests on the disappointed bidder. *See* 5 U.S.C. § 706.

The government urges, and the Court of Federal Claims found, that Garufi has not sustained the burden on this record of showing that the finding of responsibility was necessarily invalid. But the problem is that we also do not know whether the contracting officer's determination was valid either since the contracting officer's reasoning supporting that determination is not apparent from the record, and Garufi has been denied the opportunity to determine the contracting officer's explanation for finding JVC responsible. Indeed, both the government and the Court of Federal Claims noted that the record was inadequate to resolve the responsibility question. In its opinion, the Court of Federal Claims noted that the "available records do not explain the relationship between the Italian court-appointed legal administrators and a signatory agent [i.e., Salvatore La Mastra]." *Impresa,* 44 Fed.Cl. at 556. In its brief, the government admits that "as noted during oral argument, and in the opinion, neither the Court nor the parties had sufficient knowledge of Italian law to understand all aspects of how the preventive sequestration actions affected the companies involved."

This conundrum leads us into a most difficult and confusing area of administrative law, namely the circumstances under which an administrative agency will be compelled to provide an explanation for its decision.

■ The Supreme Court has established that the Administrative Procedure Act does not itself require an agency to explain the basis for its decision, unless an adjudication required to be made on the record or a formal rulemaking is involved. *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 655–56, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); *Camp v. Pitts,* 411 U.S. 138, 142 n. 3, 93 S.Ct. 1241, 36 L.Ed.2d 106. (1973).

■ Contracting officers are not obligated by the APA to provide written explanations for their actions. Decisions by contracting officers are not adjudicatory decisions to be made on the record after a hearing. *See John C. Grimberg Co. v. United States,* 185 F.3d at 1303. Nor are they formal rulemakings. As the government correctly points out, where the contracting officer makes a determination of responsibility, as opposed to the situation in which he makes a determination of nonresponsibility, the regulations do not require the contracting officer to "make, sign

and place in the contract file a determination of" responsibility which states the basis for the determination. 48 C.F.R. § 9.105–2(a).

■ However, under the APA even where an explanation or reason is not required, a reviewing court has power to require an explanation. The Supreme Court's recent decision in *LTV*, and earlier decisions in *Overton Park* and *Pitts*, make clear that, even if the agency is not obligated to provide reasons, a court may nonetheless order the agency to provide explanation if such an explanation is required for meaningful judicial review. *LTV*, 496 U.S. at 654, 110 S.Ct. 2668; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Pitts*, 411 U.S. at 142–43, 93 S.Ct. 1241.

■ The cases also establish that, in determining whether to require an explanation, the agency decision is entitled to a presumption of regularity. *Bowen v. Am. Hosp. Assn.*, 476 U.S. 610, 626–27, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986); *Motor Vehicle Mfrs. Assn. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 n. 9, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926). Because of that presumption of regularity, the agency should not be required to provide an explanation unless that presumption has been rebutted by record evidence suggesting that the agency decision is arbitrary and capricious. *Cf. United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (requiring a defendant asserting a selective prosecution claim to make a threshold showing in order to overcome the presumption of regularity of the agency decision to prosecute before the defendant is entitled to discovery).[10] The litigant challenging that presumption necessarily bears a heavy burden.

Based on the evidence of the Italian court proceedings, the Impredil filing at the Chamber of Commerce listing Carmelo La Mastra as a technical manager and company signatory, and the letters granting Salvatore La Mastra signatory authority of Lara and Impredil, which the parties agreed were all before the contracting officer, we conclude that this is one of those rare cases in which an explanation is required. Those proceedings suggest that Carmelo La Mastra at least lacks a satisfactory record of business ethics and that it may be appropriate to attribute that record to JVC because Carmelo La Mastra may control that entity either directly or through family members.

■ This leads to the final question: how should the explanation be obtained from the contracting officer? In *Overton Park*, the Court appeared to endorse the principle that when further explanation is necessary to determine if the agency acted arbitrarily and capriciously, a reviewing court "may require the administrative officials who participated in the decision to give testimony explaining their action." *Overton Park*, 401 U.S. at 420, 91 S.Ct. 814. The Supreme Court has since backed away from routinely compelling testimony of the agency decision-makers in more recent decisions such as *LTV* and *Florida Power & Light Co. v. Lorion. See LTV*, 496 U.S. at 654, 110 S.Ct. 2668; *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). These cases make clear that remand to the agency is the preferred course, and that testimony will be ordered only in "rare circumstances." *Florida Power & Light*, 470 U.S. at 744, 105 S.Ct. 1598. In *LTV*, the Court held that an "agency [should] take whatever steps it needs to provide an explanation that will enable the court to evaluate the agency's rationale," and that remand to the agency for an explanation is

---

**10.** We leave to another day the question of whether extra-record evidence may be used to

overcome the presumption of regularity.

the "preferred course." *LTV*, 496 U.S. at 654, 110 S.Ct. 2668,.

However, this "preferred course" seems out of place in this area of government procurement. The decision at issue is not the decision of the agency or agency head, but the decision of the contracting officer—an individual within the agency. Under such circumstances, remand to the agency, here the Department of Defense or one of its constituent agencies, seems unduly cumbersome. Rather, this is one of those "rare circumstances" where the reasons for the contracting officer's decision should be obtained by the contracting officer's testimony, as was done in *Overton Park*.

In ordering the deposition of the contracting officer, we wish to make clear that we are not ordering a deposition into the contracting officer's mental process, that is, the thought process by which he made his decision. Such inquiries are inappropriate. *See, e.g., United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941). The deposition is to be confined strictly to placing on the record the basis for the contracting officer's responsibility determination, that is, his grounds for concluding that JVC had a "satisfactory record of performance, integrity, and business ethics," including most particularly his assessment of the control issue. In order to answer the question of whether there was a lack of rational basis for the contracting officer's decision, we must know: (1) whether the contracting officer, as required by 48 C.F.R. § 9.105–1(a), possessed or obtained information sufficient to decide the integrity and business ethics issue, including the issue of control, before making a determination of responsibility; and (2) on what basis he made the responsibility determination.[11]

VII

The appellant also argues that the contracting officer also acted arbitrarily and capriciously in not finding JVC nonresponsible because of the alleged misrepresentation in its certification.

Part of the responsibility determination is that the contractor must "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations." 48 C.F.R. § 9.104–1(g). It is well-established that a contracting officer should consider disqualifying a proposed contractor if a material misrepresentation is made. *See, e.g., Tucson Mobilephone, Inc.,* Comp. Gen. Dec. B–258408.3, 1995 WL 335101, at *6 (June 5, 1995); *PPATHI, Inc.,* Comp. Gen. Dec. B–249182.4, 1993 WL 25128, at *3 (Jan. 26, 1993); John Cibinic, Jr. & and Ralph C. Nash, Jr., *Formation of Government Contracts* 836 (3d ed.1998). Under these circumstances, we must assume that the contracting officer considered the certification and concluded that it was not misleading. The question is whether this was arbitrary.

The certification provision specified by 48 C.F.R. § 52.209–5 requires an offeror to respond to a series of questions about debarment, civil and criminal proceedings, and default history. The certification signed here by JVC, which is identical to the language of 48 C.F.R. § 52.209–5(a)(1)(i)(B), stated that "the Offeror and/or any of its Principals" had not, "within a three-year period preceding [the] offer, been convicted of or had a civil judgment rendered against them for: commission of a fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract. . . ." Following the language of 48

---

11. While it is not entirely clear, the Italian court may also have found that "firms led by [Carmelo] La Mastra" engaged in criminal conduct quite apart from the activities of Carmelo La Mastra, Alfio Bosco and their relatives. If the record demonstrates such broader involvement by the companies, the contracting officer's reasons for making his integrity and business ethics finding in the light of that involvement will also be an appropriate subject for the deposition.

C.F.R. § 52.209–5(a)(1)(i)(C), the certification further stated that the "Offeror and/or any of its Principals" are not "presently indicted for, or otherwise criminally or civilly charged by a government entity with, commission of any of the offenses enumerated in subdivision [B above]."[12] Here JVC did not report the Italian court receivership proceeding or the indictment of Carmelo La Mastra even though the receivership had occurred within a three year period and Carmelo La Mastra was apparently "presently indicted." The failure of JVC to report the findings and indictment of the Italian courts, which appear to have been before the contracting officer, raises serious questions as to whether JVC made a material misrepresentation on the certificate.

Unfortunately, the record does not include any articulation of what the contracting officer concluded when he reviewed the certification. Since the evidence raises serious questions as to the accuracy of the certification, we must require an explanation by deposition of the contracting officer's reasons for accepting the certification.

### VIII

■ Finally, Garufi argues that the contracting officer arbitrarily excluded Garufi from the competitive range. Here, unlike the situation with respect to the business ethics and certification issues, the contracting officer provided explicit reasons for the elimination of Garufi from the competitive range, and the record evidence does not raise a substantial question concerning the rationality of the contracting officer's decision.

Garufi points out that a proposal must be treated as competitive as long as it is not so inferior as to render its terms meaningless, citing *Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229 (1983), and *M.W. Kellogg Co./Siciliana*

*Appalti Costruzioni, S.p.A. v. United States*, 10 Cl.Ct. 17 (1986). Garufi contends that the technical evaluation board did not place enough weight on the fact that Garufi proposed the incumbent subcontractors to perform a large portion of the work. Garufi also contends that the board incorrectly treated the low amount of their bid as a disadvantage, when it should have been treated as an advantage.

However, it appears that the contracting officer evaluated all of the relevant facts. Moreover, the agency provided Garufi several opportunities to answer questions presented to Garufi by the boards, both in writing and orally. Garufi merely disagrees with the weighing of the factors.

Garufi also contends that the government estimate was improperly inflated because it was based on the costs of past contracts that were themselves inflated because they were obtained by bid rigging. However, Garufi's suggestion that the contracting officer ignored this possibility is unsupported, and we note in particular that there is no showing that Garufi raised this matter with the contracting officer such that a specific response might have been expected. Nor has Garufi pointed to evidence in the administrative record showing that the costs of the earlier contracts were in fact inflated.

Here, unlike the situation with the responsibility determination and the alleged misrepresentation on the certification, Garufi has not brought forth any record evidence to make a prima facie case which raises a substantial question about the rationality of the contracting officer's decision. We therefore affirm the contracting officer's elimination of Garufi from the competitive range.

### IX

In ordering limited discovery on the business ethics and certification issues, we

---

**12.** The certification and 48 C.F.R. § 52.209–5 defines "principals" as "officers; directors; owners; partners; and, persons having primary management and supervisory responsi- bilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division, or business segment, and similar positions)."

wish to emphasize that such discovery of the contracting officer's reasoning is not lightly to be ordered and should not be ordered unless record evidence raises serious questions as to the rationality of the contracting officer's responsibility determination. "[I]f agency heads were required to testify and be cross-examined concerning the bases for each case they decide, they could not possibly perform the many other duties that are essential to the management of any major agency." 1 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* 396 (3d ed.1994). So too when the results of the contracting officer's deposition become available, the courts must recognize that the contracting officer enjoys "wide discretion" in making his determinations, including determinations on the responsibility issue. *See John C. Grimberg Co. v. United States*, 185 F.3d at 1303.

This is a most unusual case. Upon remand, the scope of discovery and the review of the contracting decision are to be appropriately limited in scope.

## CONCLUSION

For the reasons stated above, we affirm the Court of Federal Claims' decision in part, and reverse and remand in part.

AFFIRMED–IN–PART, REVERSED–IN–PART, AND REMANDED.

## COSTS

No costs.