**L–3 COMMUNICATIONS EOTECH, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**Aimpoint, Inc., Intervenor-defendant.**

**No. 08–871 C.**

United States Court of Federal Claims.

Feb. 18, 2009.[1]

1. This opinion was issued under seal on January 30, 2009. Pursuant to ¶ 7 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged. Brackets ( [ ] ) identify the material deleted. One typographical error in the opinion has also been corrected.

W. Jay DeVecchio, Washington, DC, for plaintiff. Kevin C. Dwyer, Daniel E. Chudd, Damien C. Specht and Caroline A. Keller, Washington, DC, of counsel.

Roger A. Hipp, United States Department of Justice, with whom were Gregory G. Katsas, Assistant Attorney General, Jeanne E. Davidson, Director, Harold D. Lester, Jr.,

Assistant Director, Washington, DC, for defendant.

Lawrence Block, Washington, DC, for intervenor-defendant. Dennis Lane, Washington, DC, of counsel.

## OPINION

BUSH, Judge.

This post-award bid protest is before the court on cross-motions for judgment on the administrative record filed under Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC).[2] L–3 Communications EOTech, Inc. (EOTech) challenges the December 5, 2008 modification to Contract No. W15QKN–06–C–0010 (the "old" contract). AR at 47–56. The contract modification, perhaps best described as a sole source bridge contract, would allow the United States Army Joint Munitions and Lethality Contracting Center (the Army) to procure from Aimpoint, Inc. (Aimpoint) 85,134 optical rifle sights, known as close combat optics (CCOs), for the Army and the Air Force.[3] *Id.* at 62. Aimpoint, the incumbent contractor and intervenor in this suit, provided its model "M68" CCOs through the old contract, which was signed on March 16, 2006. *Id.* at 32. The contested contract modification of the old contract is for additional M68 CCOs. Oral argument was held on January 22, 2009, and this protest is now ripe for adjudication. For the reasons discussed below, defendant's and intervenor-defendant's motions are granted, and this protest is dismissed.

---

2. The administrative record (AR), filed December 11, 2008, plaintiff's motion for judgment on the administrative record (Pl.'s Mot.), filed December 16, 2008, defendant's cross-motion for judgment on the administrative record (Def.'s Mot.) and intervenor-defendant's cross-motion for judgment on the administrative record (Aimpoint's Mot.), both filed January 5, 2009, and plaintiff's reply brief (Pl.'s Reply), filed January 12, 2009, are before the court. Defendant's pending motion to strike exhibits to plaintiff's motion for judgment on the administrative record, filed January 16, 2009, is denied because these exhibits contributed to the court's understanding of plaintiff's arguments.

3. As discussed in more detail *infra*, a sole source bridge contract may be contemplated when the government, due to upcoming shortages of urgently needed materiel, directs a contract award to an incumbent contractor. If the competitive procurement that was originally expected to provide that materiel has been delayed, the sole source award to the incumbent "bridges" the gap from one competitive procurement to the next. *Infrastructure Def. Techs., LLC v. United States,* 81 Fed.Cl. 375, 401 (2008) ("A bridge contract is used to cover immediate minimum agency needs while a bid protest or other action is pending, or to cover a transition period between competitive procurements.") (citations omitted).

## BACKGROUND[4]

The facts relevant to this bid protest have given rise to one fully litigated protest before the United States Government Accountability Office (GAO), and three separate bid protests in this court, all of which were assigned to the undersigned. On August 2, 2007, the Army issued Solicitation No. W15QKN–07–R–0428, hereinafter referred to as the "new" contract. When awarded, the new contract will be a five year Indefinite Delivery Indefinite Quantity (IDIQ) type contract, with two additional option years, for CCOs compatible with both the M4 carbine and M16 series rifles. Aimpoint provides M68 CCOs for the M4 carbine and M16 series rifles under the "old" contract.

On March 17, 2008, the Army determined that [ ] Aimpoint's bid sample [ ] was the only product which, after discussions with Aimpoint were concluded, could meet the needs of the Army under the new contract. On April 3, 2008, EOTech, a bidder on the new contract, protested to GAO. GAO held in favor of the Army and Aimpoint, and denied EOTech's protest on July 14, 2008. One day later, EOTech filed its "first" bid protest complaint in this court. That case, No. 08–515C, was decided on August 15, 2008, at which time the court enjoined the Army from proceeding with any award of the new contract based on its March 17, 2008 competitive range determination. The court also ordered the Army to retest EOTech's bid sample, if the Army chose to proceed with the solicitation for the new contract. The court's decision, *L–3 Commc'ns EOTech, Inc. v. United States*, 83 Fed.Cl. 643 (2008) (*EOTech I*), *appeal docketed*, No.2008–5111 (Fed.Cir. Aug. 28, 2008), was appealed by Aimpoint to the United States Court of Appeals for the Federal Circuit, and Aimpoint's appeal is pending as of this date.

On September 3, 2008, the Army certified its need for a bridge contract to supply American troops with more M68 CCOs. *See* AR at 13, 22. The justification for the non-competitive sole source procurement was

that existing stockpiles of CCOs would soon be depleted. *Id.* at 21. Approval for a sole source procurement, by means of a modification of Aimpoint's old CCO contract, was obtained on October 22, 2008. *Id.* at 35. On November 21, 2008, the Army posted a notice of its intent to negotiate a bridge contract with Aimpoint. *Id.* at 115. Award to Aimpoint of the bridge contract was made on December 5, 2008, and EOTech lodged its protest of that award on the same day. The Army has issued a stop work order pending the protest now before the court, which will hereinafter be described as EOTech's "second" protest. *Id.* at 120.

On December 22, 2008, EOTech filed its "third" protest in this court, concerning the retesting of its bid sample in the competition for the new contract. That case, No. 08–911 C, is ongoing, with a decision expected in mid-March 2009. The Army has agreed to stay award of the new contract until March 17, 2009. Thus, any CCOs procured through the new contract will not be available until that date or thereafter. Neither the legal issues of EOTech's first protest, nor the legal issues of EOTech's third protest, are before the court in this suit. Those protests are of interest only because the litigation of those protests has affected the current and future availability of CCOs required by the Army.

## DISCUSSION

### I. Jurisdiction

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2000). The jurisdictional grant is "without regard to whether suit is instituted before or after the contract is awarded." *Id.* Accordingly, this court has subject matter jurisdiction to entertain this bid protest.

---

4. This protest was decided on an expedited schedule, and only the most essential facts are recounted here. A recent opinion in another protest involving the same parties discusses the

Army's procurement of optical rifle sights in more detail. *L–3 Commc'ns EOTech, Inc. v. United States*, 83 Fed.Cl. 643 (2008).

## II. Standards of Review

### A. Judgment on the Administrative Record

 RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356–57 (Fed. Cir.2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1 cross-motions is akin to an expedited trial on the paper record. *Id.*

### B. Bid Protest Review

 As a threshold jurisdictional matter, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003). Standing arises from prejudice, which is proven by establishing that the plaintiff had a substantial chance of receiving the contract, but for the alleged procurement error. *Id.* (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999)). A protestor possessing a "substantial chance" of winning the contract has a "direct economic interest" in the procurement, and has standing before this court. *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307–08 (Fed. Cir.2006) (citing *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369–70 (Fed.Cir.2002)).

 As the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350–51 (Fed.Cir.2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir.2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a violation of regulation or procedure. *Impresa Con-*

*struzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001) (citations omitted). *De minimis* errors in the procurement process, however, do not justify relief. *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed.Cir.1996) (citing *Andersen Consulting v. United States*, 959 F.2d 929, 932–33, 935 (Fed.Cir.1992)). The bid protest plaintiff bears the burden of proving that a significant error marred the procurement in question. *Id.* (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988)).

 " 'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.' " *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed.Cir.1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when ... awarding the contract[,] ... it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that, but for the procurement error of the agency, there was a substantial chance that it would have won the contract award, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

### C. Sole Source Procurements

The sole source procurement in this case is governed by the Competition in Contracting Act (CICA), 10 U.S.C. § 2304 (2006), which states in relevant part:

(c) The head of an agency may use procedures other than competitive procedures only when—

. . . .

(2) the agency's need for the property or services is of such an unusual and compelling urgency that the United States would be seriously injured unless the agency is permitted to limit the number of sources from which it solicits bids or proposals....

10 U.S.C. § 2304(c). CICA also requires that "[t]he head of an agency using procedures other than competitive procedures to procure property or services by reason of the application of subsection (c)(2) or (c)(6) shall request offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e). The Federal Acquisition Regulation (FAR) has incorporated these principles in FAR 6.302–2, 48 C.F.R. § 6.302–2 (2007), and related sections. An agency conducting a sole source procurement must support this action by "written justifications and approvals." *Id.* § 6.302–2(c)(1).

As in other bid protests, a sole source procurement decision may be set aside if "(1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure." *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001) (citing *Impresa,* 238 F.3d at 1332). Under the first ground, "[t]he test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id.* (citations omitted). Under the second ground, the court examines the sole source procurement for violations of law or regulation, in the absence of which the protestor would have had a substantial chance of receiving an award under either a competitive bidding process or the sole source procurement.[5] *Id.* (citations omitted).

## III. Standing

Aimpoint contends that EOTech lacks standing to bring this bid protest because EOTech is not a qualified bidder for this sole source award. Aimpoint's Mot. at 5–14. This is a close legal question. Aim-

point relies on *Myers* for its holding that only qualified bidders may protest a sole source award. Aimpoint's Mot. at 11 (citing *Myers,* 275 F.3d at 1370–71). *Myers* is on point, because the Federal Circuit therein held that a protestor must show that it has a substantial chance of winning a sole source award in order to establish its standing in this court. 275 F.3d at 1369–70. The protestor in *Myers,* however, failed to show that it was a responsible bidder, and thus, that it was eligible for the contract award. *See Myers,* 275 F.3d at 1371 (citing 48 C.F.R. § 9.103(a) (2001)). Here, EOTech's qualification or disqualification as a potential contractor under this sole source procurement is less certain.

It is true, as discussed in more detail *infra,* that EOTech does not qualify as a provider of type-classified M68 CCOs, and thus is not a qualified supplier of the items sought in this sole source procurement. However, the Army has not stated that EOTech's products are categorically unqualified for meeting the urgent needs of the Army. Indeed, EOTech was awarded a sole source contract in 2003 because it could provide an alternative for the M68 CCO. *See* AR at 134. The Army has not taken the position that EOTech lacks standing, and indeed, has not discussed standing in its brief. Nor has the Army unequivocally stated that EOTech is an unqualified bidder for the items sought in this sole source procurement. *See* Def.'s Mot. at 11 n. 5 (noting that in some circumstances the type classification requirements for procured items may be waived). Rather, a logistical reason, in the Army's view, bars an award to EOTech. *See id.* at 10 ("Aimpoint was the only practicable source, because Aimpoint is the only manufacturer of a CCO that has been type-classified."), 11–12 (noting that the time required to complete type classification eliminates EOTech from consideration). Because the barrier to an award to EOTech, at least in the government's view, appears to be one of logistics, not disqualification, the court is hesitant to invoke the rule in *Myers* to bar EOTech's suit.

---

5. Although plaintiff cites to cases involving a different statutory scheme that permits an override of the stay afforded bid protestors before

GAO, *see, e.g.,* Pl.'s Mot. at 13 n. 7, the court finds those cases to be inapposite to the issue *sub judice.*

A recent decision of the Federal Circuit, *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340 (Fed.Cir.2008) (*DSI*), lends support to this approach. In *DSI*, the government agency, by incorporating proposed work into an existing contract, fulfilled its procurement need in a way that eliminated an opportunity for the protestors to compete directly for a government contract. *Id.* at 1342–43. The incumbent contractor then engaged subcontractors for the services required by the agency, and the protestors were not among the companies chosen as subcontractors. *Id.* at 1343. The Federal Circuit held that the protestors had standing to protest the agency action, even though there was no solicitation by the agency for which they could compete. *Id.* at 1345. The court is reluctant to adopt a strict and narrow view of its bid protest jurisdiction in the face of precedent such as *DSI*, which affirms the standing of vendors who are disadvantaged by the government's choice of a particular contract vehicle. Here, as in *DSI*, the Army is adding work to an existing contract, the conditions of which exclude EOTech's products. It is not absolutely certain that under *DSI* plaintiff lacks standing to bring this protest.

In the interests of judicial economy, even though EOTech's standing to bring this protest is uncertain under *Myers*, the court will proceed to decide the merits of this protest. EOTech appears to have a direct economic interest in this sole source procurement, because it has a substantial chance of receiving a portion of the sole source award being disputed here. EOTech would be prejudiced by an award of the contract to Aimpoint, in the court's view, at least as prejudice is measured for the purposes of establishing standing. *See L–3 Global Commc'ns Solutions, Inc. v. United States*, 82 Fed.Cl. 604, 608 n. 4 (2008) ("This court thus looks twice at prejudice, first weighing prejudice as it pertains to standing, and then more thoroughly weighing prejudice to determine whether a plaintiff shall be afforded relief.") (citations omitted); *see also DSI*, 539 F.3d at 1345 (finding standing where "[t]he contractors also possess a direct economic interest in the government action at issue in that they were both deprived of the opportunity to compete").

## IV. Whether the Army's Sole Source Award to Aimpoint was Justified

EOTech alleges that the sole source award to Aimpoint violates 10 U.S.C. § 2304(c)(2) and FAR 6.302–2. Pl.'s Mot. at 12, 14. Plaintiff rests its case on three aspects of the Army's action: "delays, failure to maximize competition before making a sole source award, and failure to limit the sole source award to its actual need." *Id.* at 14. Although plaintiff strives mightily to expose " 'a clear and prejudicial violation of applicable statutes or regulations,' " *Emery*, 264 F.3d at 1086 (quoting *Impresa*, 238 F.3d at 1333), or an arbitrary or capricious act by the Army, the court finds none in this sole source procurement. The court examines each of plaintiff's contentions in turn.

### A. Army Delays

■■■ "[T]here is a presumption ... that government [procurement] officials act in good faith." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1335 (Fed.Cir. 2004) (citing *Am–Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir.2002)) (emphasis removed). EOTech does not allege that the Army proceeded in bad faith and intentionally created an urgent and compelling need for CCOs. However, EOTech alleges that "the 'urgent' circumstances in which the Army finds itself are of its own making." Pl.'s Mot. at 14. The court agrees that, in hindsight, the Army participated to some extent in the delay of a competitive procurement of CCOs which would have replenished its dwindling stocks of optical rifle sights. However, the court believes that the Army's actions were justified under the circumstances, and that the record does not show a lack of advance planning on the part of the Army.[6]

**6.** In its reply brief, plaintiff restates its position. Plaintiff does not now wish to claim that the *shortfall* of CCOs was caused by the Army's lack of advance planning, but that the *need for a* noncompetitive procurement to cope with this shortfall was the result of the Army's lack of advance planning. Pl.'s Reply at 10–11. This argument is no more persuasive than the argu-

As plaintiff points out, a lack of advance planning cannot justify a sole source award. *See* 10 U.S.C. § 2304(f)(4)(A) (formerly codified at § 2304(f)(5)(A)); 48 C.F.R. § 6.301(c)(1) (2007). In the court's view, however, the Army has made exhaustive attempts to procure CCOs through competitive procedures, but the acquisition schedules envisioned by these planning activities have consistently been forced to yield to unforeseen increases in demand and unanticipated delays, not the least of which has been caused by litigation over the award of the new contract. The court examines the sequence of events that led to this sole source procurement.

The record shows that the competitive award of the old contract to Aimpoint on March 16, 2006 was intended to fulfill the Army's need for M68 CCOs. AR at 29, 32. The original quantity ordered under that contract was 163,000 units. *Id.* at 32. The need for M68 CCOs greatly exceeded projections, and deliveries were requested at an accelerated pace. *Id.* at 29 (showing an increase from [ ] units per month to [ ] units per month). In February 2007, less than a year into the old contract, the Army began work on a competitive procurement for the next generation of CCOs. *Id.* at 28.

In May 2007, the Army acted to prevent a predicted shortfall of CCOs, and justified the first bridge contract to Aimpoint for 93,226 M68 CCOs. AR at 22, 32. The contract modification was signed in July 2007. *Id.* at 32. The new contract's solicitation was issued in August 2007, with a closing date in September 2007. *Id.* at 28. Due to problems with the scheduling of bid sample testing, anticipated award was delayed from November 2007 to March 2008. *Id.* Then, the anticipated award date of the new contract was pushed back by two bid protests, one at GAO, and the other one in this court. *See supra.* The Army reasonably chose to await the outcome of the second protest before resorting to noncompetitive measures, because shipments under the first modification of the old contract continued through June 2008, and during the summer of 2008 sup-

plies appeared to be adequate to fulfill the Army's needs through [ ]. AR at 27, 29. On August 15, 2008, this court enjoined the Army from proceeding to award the new contract to Aimpoint based on a flawed competitive range determination, and required retesting of EOTech's bid sample before award of the new contract could be made under the solicitation.

There is nothing in the retesting of EOTech's bid sample that suggests a lack of advance planning on the Army's part. It appears to the court that the months following August 2008 have been consumed by retesting procedures, occurring on a reasonable schedule. Some of the delays in that schedule can be attributed to the Army, others to EOTech. The record shows that award of the new contract has been significantly delayed, despite adequate advance planning by the Army, and reserve supplies of the M68 CCOs are running out. The court does not find that the Army violated any statute or regulation in its advance planning for the competitive procurement of additional CCOs, a process which began in February 2007 and which has not yet reached it goal. *See Infrastructure Def. Techs., LLC v. United States*, 81 Fed.Cl. 375, 398 (2008) ("[I]t is well settled that [ ] procurement planning 'need not be entirely error-free or even actually successful. All that is required is that the planning actions be reasonable.' " (citing *Cubic Def. Sys., Inc. v. United States*, 45 Fed.Cl. 239, 258 (1999))). Thus, plaintiff's first ground for invalidating this sole source procurement, lack of advance planning, fails.

## B. Directing the Bridge Contract to Aimpoint

As plaintiff notes, the Army must seek to fulfill its urgent need for CCOs by "request[ing] offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e); 48 C.F.R. § 6.302–2(c)(2). The Army's Justification and Approval (J & A) of the bridge contract states that "Aimpoint is the only qualified producer for the Army of the M68 CCO." AR at 27. The government explains that Aim-

ment presented in plaintiff's opening brief, because the Army has exhibited an adequate

amount of advance planning in its CCO procurement activities.

point is "the only practicable source, because Aimpoint is the only manufacturer of a CCO that has been type-classified." Def.'s Mot. at 10.

Plaintiff disagrees and states that "the Army's contention in its J & A that Aimpoint is the only source from [which] it could procure the necessary sights is meritless." Pl.'s Mot. at 20. First, EOTech attempts to denigrate the importance of type classification: "The Army, or more specifically the Warfighter, does not require that the sight has met all the documentary requirements to be Type Classified, or that the sight be listed with a National Stock Number, as long as the sight performs." *Id.* at 19. Next, EOTech asserts that a sole source award it received in 2003 is evidence that its CCO should again be considered an alternative to the M68 CCO. *Id.* at 20. The court addresses these arguments in turn.

### 1. Type Classification and Materiel Release

Type classification and materiel release are governed by Army Regulation 700–142 (2008). AR at 154–228. The purpose of this regulation, in relevant part, is set forth as follows:

> This regulation assigns responsibilities and prescribes policies for the Army's type classification (TC), materiel release (MR), materiel fielding, and materiel transfer processes. The TC process ensures the materiel is acceptable for Army use prior

to spending of procurement funds at the full rate production (FRP) decision review. The MR process assures that Army materiel is safe, suitable, and supportable.

AR at 160. The regulation offers additional rationales for type classification:

> Type classification is the process used to establish the degree of acceptability of materiel for Army use and ... [d]ocuments and provides data for authorization, procurement, logistical support, asset visibility, maintenance and readiness reporting[;] [s]atisfies the Army acquisition management process to determine that materiel is "accepted for Army use" prior to spending procurement funds[; and,] [i]ntegrates the acquisition process with standard Army logistics processes that lead to production and deployment (materiel fielding) of the materiel.

*Id.* at 170. Because this regulation helps assure that purchased weaponry is acceptable, safe, suitable and supportable, and provides other organizational benefits to the Army, the court concludes that following the procedures outlined in Army Regulation 700–142, when feasible, is not an arbitrary or capricious decision.[7]

Here, Aimpoint's M68 CCO is type-classified, and EOTech's CCO is not.[8] It is uncontested that the optical rifle sights at issue here are subject to the regulation requiring type classification. *See* Def.'s Mot. at 11. Type classification of EOTech's CCO would apparently require at least [ ]. *See* AR at 29;

---

**7.** In its reply brief, plaintiff for the first time appears to argue that Army Regulation 700–142 conflicts with CICA, and should be accorded no deference. Pl.'s Reply at 7 ("Regulations restricting competition must yield to CICA's requirements.") (citations omitted). Arguments raised for the first time in a reply brief need not be considered by the court. *See Arakaki v. United States*, 62 Fed.Cl. 244, 246 n. 9 (2004) ("The court will not consider arguments that were presented for the first time in a reply brief or after briefing was complete.") (citations omitted). Even if plaintiff's argument had been timely raised, the court would reject it. The regulation in question has apparently been in place, in various forms, for over thirty years. Pl.'s Reply at 7 n. 5. As far as this court is aware, no court has found any of these versions to be in conflict with CICA, or invalid for other reasons. Plaintiff's suggestion that Army Regulation 700–142 is "anticompetitive" relies entirely on comments in

a GAO decision dealing with a superseded version of the Army's type classification regulation. *See* Pl.'s Reply at 7–8 & nn. 5–6 (citing *Christie Elec. Corp.*, B–188622, 77–2 CPD ¶ 441 (Comp. Gen. Dec. 8, 1977)). The burden for overcoming the *Chevron* deference this court affords a published regulation of a government agency, in circumstances such as these, is a heavy one. *See Favreau v. United States*, 317 F.3d 1346, 1358 (Fed.Cir.2002) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Plaintiff's attack on Army Regulation 700–142 is cursory and unpersuasive.

**8.** EOTech indicates that it has a range of CCOs which might substitute for the M68 CCO. Pl.'s Reply at 5 n. 3. The court employs a singular "EOTech's CCO" for ease of reference.

Def.'s Mot. at 11–12; Aimpoint's Mot. at 17. The Army's urgent need for CCOs does not permit a delay of [ ] or more, and thus, it is not practicable for the Army to seek offers of CCOs from EOTech.

EOTech contends, nonetheless, that performance, not type classification, is the true test of whether its CCO is a practicable alternative to the M68 CCO. Pl.'s Mot. at 19. Plaintiff also implies that type classification consists of mere "documentary requirements," *id.*, and that raising type classification as a barrier to participation in this sole source award is unreasonable, Pl.'s Reply at 6, 8–9. In addition, both the government and EOTech note that, in some circumstances, exceptions may be made concerning type classification or materiel release protocols. Def.'s Mot. at 11 n. 5 (citing AR at 156); Pl.'s Reply at 8 (citing AR at 185). These contentions do not persuade the court that it was unreasonable for the Army to insist upon type classification for the CCOs in this bridge contract. As the government points out, Aimpoint's M68 CCO is type-classified and in adequate supply, and type classification provides benefits to the Army. It is therefore reasonable for the Army to view Aimpoint as the only potential source for CCOs that is practicable under these circumstances. The court sees no violation of statute or regulation in this aspect of the Army's decision.[9]

### 2. 2003 Sole Source Award to EOTech

When the Army urgently required CCOs in 2003 and 2004, three vendors were issued sole source contracts: Trijicon Inc. contracted to provide its CCO, which was described as an "Alternate Optic for M68 CCO," on November 25, 2003; EOTech contracted to provide its CCO, also described as an "Alternate Optic for M68 CCO," on December 23, 2003; and Aimpoint contracted to provide its M68 CCO on January 22, 2004. AR at 126, 134–36. It appears from the record that Aimpoint's M68 CCO was the model of CCO that the Army preferred. *See* AR at 126, 129–31, 140, 145 (showing a greater quantity of M68 CCOs purchased, and describing the other two CCOs as alternates to the M68 CCO). Because EOTech received a sole source award for an alternate to the M68 CCO in 2003, plaintiff now argues that the Army is precluded from ignoring EOTech as a potential source for CCOs in this sole source procurement. Pl.'s Mot. at 20; Pl.'s Reply at 6 (stating that "there is no reason now that type classification should preclude another purchase of [EOTech's] CCOs").

As the government points out, the circumstances in 2003–04 were different than those underlying the Army's decision-making now. According to defendant, "the 200[3] EOTech purchase was made because the Army had no option at that time to procure a type-classified optic." Def.'s Mot. at 13. The record shows that Aimpoint can now provide the quantity of M68 CCOs that the Army requires, and conform to the schedule of deliveries requested by the Army. AR at 40. Thus, the Army now has no need to resort to alternates to a type-classified CCO. For these reasons, the court does not consider the 2003 sole source award to EOTech as proof that the Army has not, in 2008, sought "offers from as many potential sources as is practicable under the circumstances." 10 U.S.C. § 2304(e); 48 C.F.R. §§ 6.301(d), 6.302–2(c)(2). The court finds no violation of statute or regulation here.[10]

**9.** EOTech complains that it was denied an opportunity to [ ]. *See* Pl.'s Mot. at 20. According to plaintiff's version of events, the Army's decision was connected to a 2006 procurement [ ]. *See* Pl.'s Mot. Ex. 9 ¶¶ 5–9 & Atts. 1–2. The court cannot expand the scope of its inquiry in this protest to include a review of the actions of the government in a previous, unchallenged procurement. Furthermore, in the court's view plaintiff's argument is untimely under *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed.Cir.2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."). Even if the Army's decision not to [ ] was now properly before the court, the court sees nothing arbitrary or capricious in the Army's decision to proceed with a competitive procurement, rather than [ ] under these circumstances.

**10.** EOTech also argues that it is a practicable, potential source for CCOs, because it regularly sells CCOs to the United States military. Pl.'s Mot. at 3, 5, 20–21; Pl.'s Reply at 2–3, 5, 8–9. Sales of EOTech CCOs to the military do not

## C. Award of a Bridge Contract for 85,-134 CCOs over the Course of Nine Months

Plaintiff asserts that the Army's "sole source award exceeds both the minimum quantity and minimum time necessary to satisfy the unusual and compelling urgency" of the circumstances facing the Army. Pl.'s Mot. at 21. Plaintiff has not cited statutes or regulations that have been violated by the Army's alleged lack of diligence or accuracy; rather, plaintiff suggests that the Army's estimate of the quantity of CCOs that it needs, and the schedule for the delivery of CCOs, constitute arbitrary and capricious decision-making. *Id.* at 23. The court must thus " 'determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.' " *Emery,* 264 F.3d at 1085–86 (quoting *Impresa,* 238 F.3d at 1332–33).

■■■■ The court notes that the procuring authority's decision is "presumptively proper." *Infrastructure Defense,* 81 Fed.Cl. at 393 (citing *Impresa,* 238 F.3d at 1338). Furthermore, courts are especially deferential to discretionary decisions of the military in times of war. *See North Dakota v. United States,* 495 U.S. 423, 443, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990) ("When the Court is confronted with questions relating to ... military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."). Nonetheless, this court and GAO have concluded that there are "inherent limitations as to [the] scope and duration" of a sole source award by the military under the unusual and compelling urgency exception to full competition. *Filtration Dev. Co. v. United States,* 60 Fed.Cl. 371, 381 (2004) (citation omitted); *see also Signals & Sys., Inc.,* B–288107, 2001 CPD ¶ 168 (Comp. Gen. Sept. 21, 2001); *Tri–Ex Tower Corp.,* B–239628, 90–2 CPD ¶ 221 (Comp.Gen. Sept. 17, 1990). In the circumstances of this procurement, the court must decide whether a

coherent and reasonable explanation of the award has been provided in the record, and whether the scope and duration of the Army's sole source award to Aimpoint has a rational basis.

### 1. Scope

■■■■ The J & A sets forth a table noting the existing stock of CCOs, expected demand each month from [ ], and predicted shortfalls per month, with a total demand for 85,134 CCOs to be met by this sole source procurement. AR at 27. Although EOTech argues that the Army's estimates have varied over the last few months, Pl.'s Mot. at 22, the court has been given no reason to doubt the rationality of the estimates in the Army's J & A. Indeed, the supporting data for those estimates have been certified as accurate by Army personnel. AR at 34. For these reasons, the court finds that the scope of the award to Aimpoint has a coherent and reasonable explanation, and a rational basis.

### 2. Duration

■■■■ The J & A also sets forth a schedule for deliveries of the M68 CCOs. AR at 28. According to this schedule, Month 1 requires [ ] CCOs, Month 2 requires [ ] CCOs, Month 3 requires [ ] CCOs, and each succeeding month requires [ ] CCOs, until the limit of 85,134 CCOs is reached. *Id.* The modification to the old contract set these delivery dates to begin on [ ] and to end on [ ]. *Id.* at 52–55. EOTech contends that the delivery schedule "goes three months beyond the Army's anticipated need." Pl.'s Mot. at 23. The government persuasively argues that this schedule, replenishing the Army's depleted stock of CCOs with a [ ] supply of CCOs, is a rational approach to dealing with the expected shortfall and the uncertainties of both litigation and production under the new contract. Def.'s Mot. at 13–14. The court finds that the projected duration of the award to Aimpoint has a coherent and reasonable explanation, and a rational basis.

invalidate the Army's decision to limit this sole source procurement to type-classified CCOs. *See supra.* Because EOTech's CCO is not type-classi-

fied, the Army's decision that EOTech is not a practicable source under the circumstances is not a violation of statute or regulation.

## CONCLUSION

EOTech has not shown that a clear violation of statute or regulation occurred in this sole source procurement, or that the Army has been arbitrary or capricious in the award to Aimpoint. Because EOTech's protest has not succeeded on the merits, the court need not proceed to the question of prejudice, or to the question of whether EOTech has shown that it is entitled to injunctive relief. Plaintiff's motion for judgment on the administrative record is denied, and defendant's and intervenor-defendant's motions for judgment on the administrative record are granted.

Accordingly, it is hereby **ORDERED** that

(1) Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, filed December 5, 2008, is **DENIED** as moot;

(2) Plaintiff's Motion for Permanent Injunctive and Declaratory Relief, filed December 5, 2008, is **DENIED;**

(3) Plaintiff's Motion for Judgment on the Administrative Record, filed on December 16, 2008, is **DENIED;**

(4) Defendant's and Intervenor–Defendant's Cross–Motions for Judgment on the Administrative Record, both filed January 5, 2009, are **GRANTED;**

(5) Defendant's Motion to Strike Plaintiff's Declarations, filed January 16, 2009, is **DENIED;**

(6) The Clerk's Office is directed to **ENTER** final judgment in favor of defendant and intervenor-defendant, dismissing the complaint with prejudice;

(7) On or before **February 13, 2009,** counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be pre-

pared and made available in the public record of this matter; and

(8) Each party shall bear its own costs.