# In the United States Court of Federal Claims

No. 17-508C
(Filed Under Seal: May 17, 2017)
(Reissued for Publication: August 8, 2017)[*]

```
*************************************
HARKCON, INC.,                       *
                                     *
              Plaintiff,             *
                                     *
v.                                   *
                                     *
THE UNITED STATES,                   *        Post-Award Bid Protest; Motion to
                                     *        Supplement the Administrative Record;
              Defendant,             *        Effective Judicial Review; Deposition
                                     *
and                                  *
                                     *
METRIS, LLC,                         *
                                     *
              Defendant-Intervenor.  *
*************************************
```

Richard S. Toikka, Washington, DC, for plaintiff.

Michael Austin, United States Department of Justice, Washington, DC, for defendant.

Otto S. Shill, III, Phoenix, AZ, for defendant-intervenor.

## OPINION AND ORDER

**SWEENEY**, Judge

In this bid protest, plaintiff Harkcon, Inc. ("Harkcon") challenges the award of a multiyear Indefinite Delivery Indefinite Quantity ("IDIQ") Training and Analysis Support Services ("TASS") contract by the United States Coast Guard ("Coast Guard") to defendant-intervenor Metris, LLC ("Metris"). Currently before the court is Harkcon's motion to supplement the administrative record. For the reasons stated below, the motion is denied.

---

[*] The court issued this Opinion and Order under seal on May 17, 2017, and directed the parties to submit proposed redactions. As discussed in a concurrently-filed order, this reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties, with some modifications. All redactions are indicated by a bracketed ellipsis ("[. . .]").

# I. BACKGROUND

Since May 1, 2011, Harkcon has been a major subcontractor on an IDIQ contract for Training and Technical Support Services ("TTSS") for the Coast Guard.[1]  Compl. ¶¶ 2, 12. Captain Gary Bruce was chief of the Coast Guard's Force Readiness Command Training Division ("FC-T") during much of this time, from 2012 until his retirement from the Coast Guard in 2015.  Id. ¶¶ 3, 13, 32.  The FC-T is "responsible for all [Coast Guard] training," which includes "management of the current TTSS contract."  Id. ¶ 3.  As head of the FC-T, Capt. Bruce was the Coast Guard program manager on the existing TTSS contract, supervising over 100 program management staff and sixteen training commands throughout the United States.  Id. ¶ 14.  Capt. Bruce was hired by Metris following his retirement.  Id. ¶¶ 3, 32.

On October 9, 2015, the Coast Guard issued Request for Proposals HSCG23-15-R-PFC999 ("the RFP") for the TASS contract at issue in this protest.  Id. ¶¶ 1-2, 25.  The new TASS contract was designed "to be a 're-compete' of the incumbent TTSS contract, dividing out the training aspects of the TTSS contract from the technical aspects."  Id. ¶ 26.  The purpose of both the existing TTSS contract and the TASS contract at issue is to "supplement and complement the active duty and civilian staff at Coast Guard Training Centers."  Id. ¶ 27.  The FC-T had been involved in the RFP's development since May 2014.  Id. ¶¶ 3, 18-20, 24.

Harkcon, Metris, and three other offerors submitted proposals in response to the RFP.  Id. ¶ 31.  Capt. Bruce was featured in Metris's proposal as its program manager for the contract.  Id. ¶¶ 3, 32.  He had also assisted in developing Metris's proposal as a subject matter expert reviewing standard operating procedures, and participated in recruiting and selecting other personnel to join Metris.  Id. ¶¶ 3, 32, 34-35.   The Coast Guard awarded the TASS contract to Metris on or about March 8, 2016.  Id. ¶¶ 4, 38.  Harkcon was notified of the award to Metris on March 23, 2016.  Id. ¶ 38.

After a debriefing on March 28, 2016, Harkcon filed a protest with the United States Government Accountability Office ("GAO") on April 1, 2016.  Id. ¶¶ 43, 45.  Harkcon's protest rested on three grounds:  (1) an actual or apparent organizational conflict of interest ("OCI") pursuant to Federal Acquisition Regulation ("FAR") 9.505 based on Capt. Bruce's employment with Metris; (2) violation of the Procurement Integrity Act ("PIA"), 41 U.S.C. § 2102(a)-(b) (2012); and (3) violation of FAR 15.305(a) in the Coast Guard's technical evaluation of Harkcon's proposal.  Id. ¶¶ 4, 45-46.  On April 15, 2016, the Coast Guard announced it would take corrective action in the form of an investigation into Harkcon's OCI and PIA allegations. Id. ¶¶ 4, 47.  Accordingly, despite Harkcon's objections, the GAO dismissed the protest as academic on April 21, 2016.  Id.  Following the investigation's conclusion, the Coast Guard reaffirmed its award to Metris on December 5, 2016.  Id. ¶¶ 5, 49.  After a debriefing, Harkcon filed a second bid protest with the GAO on December 23, 2016.  Id. ¶¶ 5, 63.  Harkcon based its second protest on the same grounds as its original protest, and also alleged that the corrective action investigation was inadequate.  Id.

---

[1]  The facts in this section are derived from Harkcon's complaint.  They are also supported by the administrative record ("AR").

The GAO denied Harkcon's second protest on March 30, 2017, id. ¶ 5, 74, and Harkcon filed the instant bid protest on April 12, 2017. The administrative record was filed on April 28, 2017. Harkcon moved to supplement the administrative record on May 4, 2017. Pursuant to the court's May 4, 2017 order setting an expedited briefing schedule on Harkcon's motion to supplement, defendant and Metris filed responses on May 10, 2017, and Harkcon filed its reply on May 12, 2017. The motion is fully briefed, and the court considers oral argument unnecessary.

## II. DISCUSSION

In bid protests, the United States Court of Federal Claims reviews the procuring agency's action pursuant to the standards set forth in 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4) (2012). Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004). Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973); accord Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009). An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review. See Camp, 411 U.S. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision."). In determining "whether the contracting agency provided a coherent and reasonable explanation for its exercise of discretion," bid protesters carry a "heavy burden of showing that the [agency action or decision] had no rational basis." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001).

The administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with [5 U.S.C. § 706(2)(A)]." Axiom, 564 F.3d at 1381; accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." (internal quotation marks omitted)). Supplementation is appropriate when "information upon which the agency relied when it made its decision" is lacking, including "documentation revealing the agency's decision-making process." Parcel 49C Ltd. P'ship v. United States, 127 Fed. Cl. 570, 573 (2016). Supplementation might also be necessary "when a subjective value judgment has been made but not explained" or when the administrative record "is missing relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, . . . or the content of conversations." Id. (internal quotation marks omitted). Information that "should have been considered by the agency," but was not, is also appropriate for supplementation. E. W., Inc. v. United States, 100 Fed. Cl. 53, 75 (2011). In particular, depositions may be necessary when the administrative record does not include a basis for the contracting officer's decision. Impresa, 238 F.3d at 1339. The party seeking to supplement the

administrative record bears the burden of demonstrating why the existing record is insufficient. DataMill, Inc. v. United States, 91 Fed. Cl. 722, 732 (2010).

## A. Documents

Harkcon seeks to supplement the administrative record with four documents concerning the corrective action investigation: (1) the Coast Guard Administrative Investigations Manual ("AIM"), (2) the investigating officer's investigation plan, (3) the investigating officer's investigation log, and (4) the January 14, 2016 pre-negotiation memorandum ("PNM").[2] Metris takes no position on supplementing the administrative record with these documents. Defendant opposes their inclusion.

Defendant asserts that the AIM is a "publicly available document," and that therefore it may be "freely cited" even without being included in the administrative record. Def.'s Resp. 4. Defendant is correct. Pursuant to Rule 201 of the Federal Rules of Evidence, the court takes judicial notice that the AIM, which Harkcon attached as an exhibit to its motion to supplement, can be purchased in hard copy form on Amazon.com or downloaded electronically without cost from the Coast Guard website.[3] Accordingly, it is unnecessary to supplement the administrative record with the AIM.

With respect to the investigation plan and investigation log, defendant asserts that "[n]either document exists," noting that neither is actually required under the AIM. Id. Whether or not an investigation plan and log were required, they clearly cannot be included in the administrative record if they do not exist. To the extent that the investigation plan and log were required but not produced or maintained, such failure to produce or maintain can be addressed by Harkcon in its merits briefing and at oral argument.

Finally, Harkcon contends that the January 14, 2016 PNM should have been included in the administrative record. The January 14, 2016 PNM is referenced in the investigating officer's report:

> [. . .]

AR 1252; see also id. at 1342 (identifying, in a list of exhibits to the investigating officer's report, Exhibit 39 as "Award Memorandum dtd 8MAR16"). Harkcon interprets these paragraphs from the report as indicating the existence of two separate documents: a January 14, 2016 PNM, and a March 8, 2016 Award Memorandum. Defendant avers that the administrative record already contains the information that Harkcon seeks to add because (1) the administrative record

---

[2] Harkcon erroneously refers to a "January 16, 2016" PNM, Pl.'s Mot. 7, but later refers to a "January 14, 2016" completion date for the PNM. Pl.'s Reply 11.

[3] See, e.g., U.S. Coast Guard, Administrative Investigations Manual: COMDTINST M5830.1A (Sept. 2007), http://www.uscga-district-7.org/PDF/legal/Administrative%20Investigations%20Manual%20COMDTINST%205830.1A.pdf.

contains the document to which the investigative officer refers—a document titled "Award Memorandum" that was submitted by the contracting officer on February 18, 2016, and approved on March 8, 2016, see id. at 1512-55; and (2) the terms "PNM and . . . award memorandum are used interchangeably" in Coast Guard parlance, Def.'s Resp. 4.

It appears that the January 14, 2016 PNM is indeed the same document as the March 8, 2016 Award Memorandum. The March 8, 2016 Award Memorandum contains a chronology of events for the procurement. AR 1519. This chronology includes the completion of the "Pre Negotiation (Award on Initial Offers) Memo" on January 14, 2016, and the approval of the same document on a date to be determined. Id. The first page of the March 8, 2016 Award Memorandum reflects that the contracting officer submitted the document on February 18, 2016, and that the document was approved by the deputy head of contracting activity on March 8, 2016. Id. at 1512. Reading the document as a whole, it is apparent that the document was prepared on January 14, 2016, submitted on February 18, 2016, and approved on March 8, 2016. Moreover, on multiple occasions during his investigative interview, Coast Guard contracting specialist Alan Boucher discussed the "Pre-Negotiation/Award Memo" that he drafted, id. at 1418, 1424; Coast Guard contracting officer Robert Mann-Thompson also indicated that Mr. Boucher drafted the PNM before it was reviewed and submitted by Mr. Mann-Thompson, id. at 1432. Thus, Harkcon's characterization of the "Award Memorandum [referring] to itself by a different name, with different dates and locations than the Award Memorandum itself," Pl.'s Reply 11, is simply inaccurate. In short, since the January 14, 2016 PNM is already included in the administrative record (as the March 8, 2016 Award Memorandum), it is unnecessary to supplement the administrative record with the PNM.

## B. Deposition of Investigating Officer

In addition to seeking to supplement the administrative record with certain documents, Harkcon seeks to depose the investigating officer, Romeo Rigor. Harkcon argues that there are facial deficiencies in Mr. Rigor's investigation and report that need to be explored in a deposition, namely, that (1) Mr. Rigor was an improper choice to conduct the investigation based on his civilian pay grade vis-à-vis the military rank of Capt. Bruce, (2) the Coast Guard should have conducted a different type of investigation, and (3) there exist various omissions and inconsistencies between the report's findings of fact and concluding opinions.

Metris and defendant both oppose Harkcon's request to depose Mr. Rigor. Metris contends that Harkcon failed to meet its burden of showing that a deposition is necessary, observing that Mr. Rigor provided a basis for his conclusions, that there is no evidence of bad faith or irregularity, that the deposition would not produce any useful information that would assist the court in reviewing Harkcon's claims, and that the deposition sought by Harkcon would be an inappropriate inquiry into Mr. Rigor's internal thought process. Defendant echoes these concerns, noting that "Harkcon fails to identify any 'hard facts' which show[] that the [Coast Guard's] decision was arbitrary and capricious, irrational or otherwise not in accordance with law." Def.'s Resp. 5. Harkcon insists, however, that deposing Mr. Rigor is necessary for "effective judicial review of the [Coast Guard's] action(s)." Pl.'s Reply 7 (citing Axiom, 564 F.3d at 1381).

### 1. Mr. Rigor's Civilian Pay Grade

Harkcon's first basis for requesting to depose Mr. Rigor is that he was outranked by Capt. Bruce. Harkcon does not provide any support for its assertion concerning Mr. Rigor's pay grade. However, even assuming (without deciding) that Capt. Bruce's civilian equivalent rank was higher than that of Mr. Rigor, it is not clear that their comparative ranks are relevant because Capt. Bruce retired from the Coast Guard over a year before the investigation began.[4] Nevertheless, Mr. Rigor interviewed at least four active-duty Coast Guard officers with a higher civilian equivalent rank than that held by Mr. Rigor (as alleged by Harkcon). See AR 1342 (including four active-duty Coast Guard officers holding the rank of Commander among the list of individuals interviewed during the investigation).

Harkcon is correct that the provisions of the AIM—which was referenced in the convening order memorandum to Mr. Rigor directing him to conduct the investigation, see id. at 1232, as well as the investigative report itself, see id. at 1234—indicate that a standard administrative investigation "should" be conducted by an individual "of at least equivalent rank (or civilian pay grade), and preferably senior to, any persons whose conduct is subject to inquiry." AIM 3-5.[5] Although there is a preference for commissioned officers, as noted by Harkcon, enlisted personnel and civilians are authorized to conduct standard investigations. Id. Assuming, for purposes of the instant motion only, that the Coast Guard was required to follow the AIM, these provisions do not prevent a civilian employee from investigating Coast Guard personnel with a higher equivalent rank.[6] Without more, the relative ranks of Mr. Rigor, Capt. Bruce, and the other Coast Guard officers and employees involved are not evidence of bias, irregularity, or bad faith related to the manner in which Mr. Rigor conducted the investigation. To the extent that it was improper for Mr. Rigor to conduct the investigation based on his pay grade, deposing Mr. Rigor will not uncover evidence of any such impropriety because he was simply following orders. See AR 1232-33 (convening order memorandum directing Mr. Rigor to conduct the investigation). Therefore, Mr. Rigor's pay grade is an insufficient basis upon which to permit his deposition.

### 2. Type and Manner of Investigation

Next, Harkcon avers that the investigation was flawed because it was a single-officer standard investigation. See id. at 1232 (directing Mr. Rigor to conduct "a single-officer standard investigation under [the AIM]"). Harkcon posits that it was "a poor choice to conduct an

---

[4] Capt. Bruce retired from the Coast Guard effective May 1, 2015. AR 1238, 1265, 1443. The convening order directing Mr. Rigor to conduct his investigation is dated May 27, 2016. Id. at 1232. Capt. Bruce was interviewed on July 1, 2016. Id. at 1342; see generally id. at 1443-54 (summary of interview with Capt. Bruce).

[5] The AIM is separately paginated by chapter. For example, page 3-5 of the AIM is the fifth page of the third chapter.

[6] Whether or not the Coast Guard (as an agency) was required to follow the AIM, Mr. Rigor himself was under specific directions to do so. See AR 1232.

administrative investigation," suggesting that a formal investigation or perhaps a criminal investigative referral would have been more appropriate. Pl.'s Mot. 9-10; see also AIM 3-9 (table comparing standard, formal, and court of inquiry investigations). Similar to the issue of Mr. Rigor's pay grade, to the extent that it was improper to conduct a single-officer standard investigation as opposed to any other type of investigation, deposing Mr. Rigor will not provide any evidence of such impropriety. Mr. Rigor did not determine the type of investigation; he was simply following orders. See AR 1232-33 (convening order memorandum).

In addition to the type of investigation, Harkcon asserts that the manner in which Mr. Rigor conducted the investigation was deficient because (1) he provided summaries of interviews with witnesses rather than sworn statements and (2) those interviews were conducted telephonically rather than personally. Harkcon explains that, according to the AIM, investigating officers are empowered to take testimony under oath and that "in-person interviews are the most effective means to obtain witness statements." Pl.'s Mot. 10 (internal quotation marks omitted). Harkcon's reading of the AIM in this regard is incomplete. While investigating officers have the authority to administer oaths, only "[a]ctive duty personnel, or personnel performing inactive duty training" have such authority, and only in certain situations. See AIM 4-1 (authority to administer oaths). In other words, a civilian employee, such as Mr. Rigor, does not have the authority to administer oaths. Even assuming that Mr. Rigor had the authority to administer oaths, he was not required to do so. See id. (explaining that testimony "may" be given under oath).

Further, the investigating officer "is free to determine and use the most effective methods of collecting, analyzing, and recording all relevant information," including whether to interview witnesses "by personal interview, correspondence, telephone inquiry, or other means." Id. at 4-2; see also id. at 4-5 (explaining that although "[i]n-person interviews are the most effective means to obtain witness statements," other means, including telephone interviews, are permissible). Contrary to Harkcon's suggestion, the AIM indicates that summaries of verbal interviews are actually more effective than written statements from witnesses because "witnesses frequently provide more information in verbal interviews than . . . in the written statements." Id. at 4-5. In particular, when "a known or potential claim against the United States" is involved (as is the case here), an investigating officer "shall not ask for a written statement" from witnesses, and instead "shall only prepare a summary of interview."[7] Id. at 4-6 (emphasis added).

In sum, contrary to Harkcon's assertions, the manner in which Mr. Rigor conducted the investigation appears to comport with the provisions of the AIM. Therefore, it is an insufficient basis upon which to permit Mr. Rigor's deposition.

---

[7] The AIM distinguishes between "Coast Guard" and "Non-Coast Guard" witnesses, and permits written statements from the latter when claims against the federal government are involved. AIM 4-6. However, all of the witnesses involved in the case at bar are "Coast Guard" witnesses for the purposes of the AIM. See id. (defining a "Coast Guard" witness as "a Coast Guard member, employee, Auxiliarist, contractor, or agent").

### 3. Omissions and Inconsistencies

Finally, Harkcon argues that the administrative record fails to provide information regarding Mr. Rigor's rationale in choosing witnesses and assigning weight to certain facts, the involvement of the Coast Guard legal office in developing and executing the investigation, and reasons for delaying the progress of the investigation. In addition, Harkcon contends that "the findings of fact and opinions drawn therefrom in the Investigative Report raise 'serious questions as to the rationality of the procurement decision' by the Coast Guard." Pl.'s Mot. 11 (relying on Impresa, 238 F.3d at 1338-40). Harkcon lists several points of disagreement with the conclusions of Mr. Rigor, stressing that there were myriad inconsistencies. Harkcon also insists that the lack of an investigation plan and investigation log leaves holes in the record that can only be filled through deposing Mr. Rigor.

Harkcon's argument here is unpersuasive for several reasons. First, its reliance on Impresa is misplaced because the Impresa decision is concerned with the "rationality of the contracting officer's" decision, Impresa, 238 F.3d at 1341 (emphasis added), and Mr. Rigor was not the contracting officer. To the extent that Impresa applies to Mr. Rigor, the Impresa court explicitly stated that "discovery of the contracting officer's reasoning is not lightly to be ordered," id., because it is "inappropriate" to inquire into "the thought process by which" a decision is made, id. at 1339. In other words, since the purpose of a deposition is to uncover the rationale of a challenged decision, courts should not permit a deposition when the basis for that decision has already been provided. Here, Mr. Rigor provided [. . .] findings of fact spanning [. . .], buttressed by [. . .] exhibits spanning [. . .], to support his opinions and conclusions, see id. at 1234, 1337-41. In addition, contrary to Harkcon's assertions, Mr. Rigor addressed the length of time required to complete his investigation. See, e.g., id. at 1234. Inquiring further into his internal thought process, i.e., his rationale for choosing witnesses and assigning weight to certain facts, is beyond the proper scope of a deposition. While Harkcon disagrees with the conclusions reached by Mr. Rigor, Harkcon's assertion that Mr. Rigor does not provide a rationale for his conclusions is meritless. Thus, the Impresa decision actually supports defendant's and Metris's positions.

Second, questioning the involvement of the Coast Guard legal office in developing and executing the investigation appears to be merely another attempt to inquire into the process by which Mr. Rigor reached his conclusions. As explained above, such an inquiry is improper because Mr. Rigor provided a rationale for his conclusions. Therefore, even assuming that the work-product privilege could be overcome, examining the involvement of the legal office cannot be a basis for allowing Mr. Rigor's deposition. Further, to the extent that the involvement of the legal office is an appropriate inquiry, it is not clear that Mr. Rigor would be the proper deponent.

Third, Harkcon's description of the inconsistencies between the evidence uncovered during the investigation and Mr. Rigor's conclusions reflect an implication by Harkcon that Mr. Rigor is somehow biased. However, there is no evidence of bias in Mr. Rigor's investigative report. An unfavorable conclusion, without more, is insufficient to show bias or prejudice. Cf. Liteky v. United States, 510 U.S. 540, 555-56 (1994) (explaining that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion" unless those rulings "rel[y] upon knowledge acquired outside such proceedings" or "display[] deep-seated and unequivocal

antagonism that would render fair judgment impossible"). When a rationale has been provided by the agency, supplementing the administrative record will only be permitted when where are "allegations of bad faith . . . based on hard facts." Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 130 (2010) (internal quotation marks omitted). Simply put, adverse conclusions are not "hard facts" that show "motivation or conduct that is hard to explain absent bad faith." Id. (internal quotation marks omitted). Here, as explained above, Mr. Rigor provided a detailed basis for his conclusions. Assuming, without deciding, that Mr. Rigor's conclusions are incorrect, they are not so flawed as to demonstrate personal animus. Thus, Harkcon's implied allegations of bias do not provide a reason to supplement the administrative record through deposing Mr. Rigor.

In sum, because Mr. Rigor provided a rationale for his conclusions, the alleged omissions and inconsistencies in the investigative report, even if true, are an insufficient basis upon which to permit him to be deposed.

### III. CONCLUSION

For the reasons stated above, Harkcon has failed to meet its burden of showing that the administrative record should be supplemented by any of the documents listed in its motion or by the deposition of Mr. Rigor. The administrative record, as it presently exists, will allow for effective judicial review. To the extent that there were deficiencies in the investigation, they are relevant with respect to whether or not the contracting officer's decision to affirm the award to Metris was arbitrary and capricious, and can be addressed by Harkcon in its merits briefing and at oral argument. Accordingly, Harkcon's motion to supplement the administrative record is **DENIED**. An order providing an updated briefing schedule will issue separately.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge