# United States Court of Appeals
# for the Federal Circuit

---

**WELLPOINT MILITARY CARE CORP.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, OPTUM PUBLIC SECTOR
SOLUTIONS, INC.,**
*Defendants-Appellees*

---

2019-2225

---

Appeal from the United States Court of Federal Claims
in No. 1:19-cv-00676-LKG, Judge Lydia Kay Griggsby.

---

Decided: March 31, 2020

---

MARK COLLEY, Arnold & Porter Kaye Scholer LLP, Washington, DC, argued for plaintiff-appellant. Also represented by KARA L. DANIELS, MICHAEL EDWARD SAMUELS, NATHANIEL EDWARD CASTELLANO.

STEVEN MICHAEL MAGER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE.

JASON ANDREW CAREY, Covington & Burling LLP, Washington, DC, argued for defendant-appellee Optum Public Sector Solutions, Inc.  Also represented by KEVIN BARNETT, MARK MOSIER, KAYLEIGH SCALZO, EVAN RYERSON SHERWOOD, BROOKE STANLEY.

————————————

Before DYK, TARANTO, and CHEN, *Circuit Judges.*

DYK, *Circuit Judge.*

This case involves a contract awarded by the United States Department of Veterans Affairs ("VA") to Optum Public Sector Solutions ("OPSS") for developing and managing the VA's program to provide veterans access to community-based healthcare in Region 3 of the VA's Community Care Network.  WellPoint Military Care Corporation ("WellPoint"), an unsuccessful bidder, brought a bid protest action in the Court of Federal Claims ("Claims Court") challenging the award.  The Claims Court found that the VA conducted a reasonable best value determination, denied WellPoint's request for injunctive relief, and dismissed WellPoint's bid protest challenge.  We affirm.

BACKGROUND

On December 28, 2016, the VA issued Request for Proposal No. VA791-16-R-0086 ("the Solicitation") seeking proposals to develop and manage community-based healthcare networks in the VA's Community Care Network.  The Solicitation stated that the Community Care Network was divided into four geographic regions, and that the VA contemplated awarding a maximum of one single-award, firm-fixed-price indefinite-delivery, indefinite-quantity contract per region.  The Solicitation explained that the VA would conduct a negotiated best value determination based on four factors: (1) Technical, (2) Past Performance, (3) Socioeconomic Concerns, and (4) Price.  The Solicitation stated that "[f]actors 1, 2, and 3 are listed in descending order of importance," and that "[t]he non-price

factors . . . , when combined, are significantly more important than Price." J.A. 542. The Technical factor was further divided into three subfactors, (1) Network Management and Claims Adjudication, (2) Management Approach, and (3) Corporate Experience/Capability. The Solicitation stated that "subfactors 1 and 2 are of equal importance, and both individually are more importan[t] than subfactor 3." *Id.* With respect to subfactor 3, the Solicitation required that each bidder:

> Provide a general corporate background, experience, and qualifications of the organization to include any offeror's joint venture partner(s) or affiliate(s)/parent organization(s) if the information provided shows that the workforce, management, facilities or other resources of the joint venture partner(s), affiliate(s)/parent organization(s) will bear on the likelihood of successful performance by the Offeror.

J.A. 536.

OPSS and WellPoint submitted bids for Region 3 of the Community Care Network ("Region 3").[1] Ultimately, the evaluation of the two competing bidders was as follows:

---

[1]    Region 3 includes Oklahoma, Arkansas, Louisiana, Tennessee, Mississippi, Alabama, Georgia, South Carolina, Florida, Puerto Rico, and the United States Virgin Islands.

4          WELLPOINT MILITARY CARE CORP. v. UNITED STATES

| Factor | WellPoint | OPSS |
|---|---|---|
| Technical | Acceptable | Good |
| Subfactor 1: Network Management and Claims Adjudication | Good | Good |
| Subfactor 2: Management Approach | Acceptable | Good |
| Subfactor 3: Corporate Experience/ Capability | Acceptable | Outstanding |
| Past Performance | Somewhat Relevant/Satisfactory Confidence | Somewhat Relevant/Satisfactory Confidence |
| Socioeconomic Concerns | Partial and Minor Credit | Partial and Minor Credit |
| Price | 0.24398 | 0.18968 |

J.A. 6.

On December 14, 2018, the Source Selection Authority ("SSA") issued a Source Selection Decision ("the Decision") awarding the Region 3 contract to OPSS.

This case concerns the VA's evaluation of the Price factor and the Corporate Experience/Capability subfactor.

On January 22, 2019, WellPoint filed a protest with the United States Government Accountability Office ("GAO"), challenging several aspects of the VA's award decision. The GAO denied WellPoint's protest, finding "no basis [in the administrative record] to question the agency's judgments in performing the evaluation." J.A. 2372.

On May 8, 2019, WellPoint filed a post-award bid protest in the Claims Court seeking declaratory and injunctive relief.  As relevant to this appeal, WellPoint argued before the Claims Court (1) that "the VA's best value determination and trade-off analysis were flawed" because the VA understated WellPoint's relative cost savings in the Price factor; and (2) that "the VA treated offerors unequally when evaluating the solicitation's Corporate Experience/Capability Subfactor," i.e., that the VA gave greater credit to OPSS, the winning bidder, for its overall corporate experience and capability than WellPoint, a losing bidder.  J.A. 2.

The parties filed cross-motions for judgment on the administrative record.  The Claims Court rejected WellPoint's argument as to the cost savings evaluations.  The Claims Court also rejected WellPoint's unequal treatment claim, finding that WellPoint had failed to demonstrate that the VA committed a prejudicial error because the SSA's award decision did not reflect any unequal treatment, and that the SSA's evaluation of the proposals was "reasonabl[e]" and "consistent with the requirements."  J.A. 19.

The Claims Court concluded that "the VA conducted a reasonable evaluation, reasonably found that [OPSS] presented the best value to the government, and that the VA made a sound decision to award the Contract to [OPSS]," denied WellPoint's request for injunctive relief, and dismissed the case.  J.A. 23–24.  WellPoint appeals, and we have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review the Claims Court's assessment of agency actions de novo under the standard set forth in the Administrative Procedure Act ("APA").  *Comint Sys. Corp. v. United States*, 700 F.3d 1377, 1381 (Fed. Cir. 2012).  Under that standard, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "[A] bid

award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Importantly, the APA requires that "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. "To prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999). We review the legal standard for prejudice articulated by the Claims Court de novo, and we review the Claims Court's underlying factual findings for clear error. *Bannum Inc. v. United States*, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005).

I

WellPoint's first argument (relating to the cost savings calculation) boils down to an assertion that the VA committed a mathematical error. The VA assigned WellPoint's proposal a cumulative weighted score of 0.24398, meaning that WellPoint's proposed prices were "about 24.398% less than what the Government expect[ed] to pay." J.A. 2041. The VA assigned OPSS's proposal a cumulative weighted score of 0.18968, which translated to prices "about 18.968% less than [what] the Government expect[ed] to pay." *Id.* The SSA concluded that "WellPoint's score represents . . . a 5.430% additional cost savings over what [OPSS] proposed," i.e., that the absolute difference in savings between the two proposals was 5.430%. *Id.* WellPoint argues that the SSA was required to use the relative difference in savings between WellPoint's proposal and OPSS's proposal: 28.627%. But the methodology that WellPoint advances is merely a different way of describing the same comparison. The VA did not act irrationally by choosing one of two equivalent methodologies. Indeed, there is a third way of comparing the magnitude of the cost savings—by comparing the expected cost savings under WellPoint's proposal

(said to be $134 million) to the overall contract price (said to be $2.47 billion). This comparison shows that it is the same 5.430% savings, additionally confirming reasonableness of the agency's methodology.

WellPoint also asserts that the SSA failed to recite the "true magnitude," i.e., the dollar amount of the cost savings, of each proposal. Appellant's Br. 40. However, nothing in the Solicitation, the Federal Acquisition Regulation ("FAR"), or the Competition in Contracting Act of 1984, 41 U.S.C. § 3306(c), requires the SSA to recite dollar amounts in an award decision, dollar amounts that were uncertain at the time of contract formation, given the indefinite-delivery, indefinite-quantity nature of the contract.

We conclude that the Claims Court correctly found that the "VA's methodology for evaluating price in connection with this procurement was both reasonable and in accordance with the terms of the Solicitation." J.A. 20.

## II

### A

WellPoint next argues that the VA "treated WellPoint and OPSS disparately" when evaluating their proposals under the Corporate Experience/Capabilities subfactor. Appellant's Br. 46. FAR § 1.602-2(b) requires SSAs to give "impartial, fair, and equitable treatment" to all government contractors. *See Office Design Grp. v. United States*, No. 19-1337, slip op. at 7 (Fed. Cir. 2020). This court has recently held that to demonstrate unequal treatment, "a protestor must show that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical [to] those contained in other proposals'" or that "the agency inconsistently applied objective solicitation requirements between it and other offerors." *Id.* at 7 (collecting cases). "To prevail, [the protestor] must show that [the] instance of unequal treatment was prejudicial." *Id.* at 10. The Claims Court

rejected WellPoint's unequal treatment claim, finding that WellPoint's alleged error "did not prejudice WellPoint with regard[] to the VA's award decision." J.A. 18.

The proposals here were evaluated by the VA utilizing a Source Selection Plan ("SSP") approved by the SSA.[2] The SSP stated that the proposals were evaluated using a "three-tier approach [that] consist[ed] of a Source Selection Evaluation Board (SSEB), Source Selection Advisory Council (SSAC) and the Source Selection Authority (SSA)." J.A. 1935.

The first tier of review was the SSEB. The SSEB consisted of a Chairperson, legal counsel, and four evaluation teams. The four evaluation teams corresponded to the four factors identified in the Solicitation: (1) the Technical Evaluation Team ("TET"); (2) the Past Performance Evaluation Team; (3) the Socioeconomic Evaluation Team; and (4) the Price Evaluation Team. The SSEB's report consisted of four individual reports prepared by the four separate evaluation teams. We are concerned here with the TET report and particularly the portion of the report dealing with the Corporate Experience/Capability subfactor.

The second tier of review was the SSAC. The SSAC consisted of a Chairperson, legal counsel, and three other members. The SSAC was responsible for reviewing the SSEB's report "to ensure the evaluation process follow[ed] the evaluation criteria and the ratings [were] appropriately and consistently applied" and "consolidat[ing] the advice

---

[2]    Although the SSP is an internal agency document that was not part of the Solicitation, WellPoint does not argue that the SSP is inconsistent with the Solicitation or that VA has departed from the procedures set forth in the SSP. Both parties treat the SSP as governing, and we do as well. We consider the SSP in evaluating the rationality of the agency's actions.

and recommendations . . . into a written comparative analysis and recommendation" for the SSA. J.A. 1978. The SSAC had the authority to "add or remove a strength, significant weakness, omission or deficiency" assigned by the TET to "ensure [that] the evaluation process follow[ed] the evaluation criteria and that the ratings are appropriately and consistently applied." J.A. 1979.

The SSA was the final authority. The SSA "use[d] the factors established in the SSP and solicitation to make the source selection decision in accordance with FAR [§] 15.308." J.A. 1943. FAR § 15.308 required that the SSA use his "independent judgment." FAR § 15.308 (providing that "[w]hile the SSA may use reports and analyses prepared by others, the source selection decision shall represent the SSA's independent judgment"); *see also* J.A. 1943 (explaining that the SSA was to make the final award decision under the SSP in accordance with FAR § 15.308). The SSA oversaw the procurement and selected the members of the selection team, i.e., SSAC and SSEB.

B

WellPoint alleges that the TET report failed to appreciate the fact that OPSS (the successful bidder) was a different entity from "the larger [OPSS] corporate family," despite treating WellPoint (an unsuccessful bidder) as an entity distinct from its parent corporation, Anthem. Appellant's Br. 20–21. WellPoint argues that the TET evaluated WellPoint's proposal by focusing WellPoint "standing alone," without subjecting OPSS's proposal to the same level of scrutiny. Appellant's Br. 47. WellPoint identifies three specific alleged errors in the TET's report: (1) the TET's statement that WellPoint had only three years of experience in the healthcare industry and, "standing alone, [did] not have adequate corporate depth to manage a large, complex and comprehensive healthcare network," J.A. 1265; (2) the TET's focus on the fact that WellPoint "employ[ed] only 9 staff," *id.*; and (3) the TET's observation

that "[t]he fact that [WellPoint] plans to rely on an affiliate . . . increases the risk of unsuccessful performance," *id.*, and "[t]he lack of detail of [WellPoint as] the prime [offeror] raise[d] questions regarding [WellPoint's] background, and qualifications in managing a federal health care network of similar size or scope as the [Community Care Network] contract," J.A. 1430.

WellPoint asserts that the TET evaluation of OPSS's proposal, unlike its evaluation of WellPoint's proposal, did not focus on OPSS's capabilities, "standing alone." WellPoint argues that the TET credited OPSS with the background, experience, and qualifications of its entire corporate family. For example, WellPoint points out that the TET credited OPSS with the corporate experience and capabilities of its parent corporation, UnitedHealth Group, which was "an organization with experience serving 134 million individuals worldwide." J.A. 1440.

In short, WellPoint argues that the TET myopically focused on WellPoint as an individual entity and failed to credit WellPoint for the strengths of the Anthem corporate family. WellPoint asserts that, in contrast, the TET's evaluation of OPSS's proposal never criticized OPSS for its limited individual capabilities, and credited OPSS with the full experience and capabilities of the Optum corporate family.

C

Even if we were to accept WellPoint's assertion that the TET report reflected unequal treatment, this would not establish that the VA committed a prejudicial error. This is so because the TET's findings were further reviewed by two more entities: the SSAC and the SSA.

Because the SSA had the full authority to award the contract to WellPoint instead of OPSS, we need not be concerned with errors in the interim reports by the TET or SSAC unless they were carried forward to the SSA's final

decision. In *Shinseki v. Sanders*, 556 U.S. 396 (2009), the Supreme Court explained that the prejudicial error inquiry under the APA involves the "same kind of 'harmless-error' rule that courts ordinarily apply in civil cases." *Id.* at 406. "[T]he factors that inform a reviewing court's 'harmless-error' determination are various, potentially involving, among other case-specific factors, an estimation of the likelihood that the result would have been different [and] an awareness of what body . . . has the authority to reach that result . . . ." *Sanders*, 556 U.S. at 411. Under this standard, an error in the TET report, standing alone, is not prejudicial. "*De minimis* errors in the procurement process do not justify relief." *Office Design*, No. 19-1337, slip op. at 10. To show prejudicial error, WellPoint must show a "substantial chance" that the SSA (the body with authority) would have made a different award decision but for the alleged error in the TET report. *Id.*; *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

## D

WellPoint argues that the alleged errors in the TET report were in fact prejudicial because they were carried over to the SSA's decision. WellPoint asserts that the alleged TET errors were reproduced in the SSAC's comparative analysis, which was in turn relied upon by the SSA. WellPoint attempts to establish this connection by citing to portions of the SSAC's comparative analysis document repeating the same alleged error that appeared in the TET report. However, WellPoint's citation is not to the SSAC's own analysis, but rather, its summary of the TET's findings. WellPoint has not established error in the SSAC's own analysis.

The SSA's decision document is also free of error. First, the SSA's decision contains no citation or reference to the alleged errors in the TET report. WellPoint concedes in its briefing that the problematic language is not present in the

SSA's award decision. Instead, the SSA's decision reflected a reliance on other elements of the TET report, but not the alleged errors. The SSA's decision statement noted that "selection was made based upon the factors established in the solicitation, [the SSA's] review of the [SSAC] comparative analysis, the detailed evaluation results submitted by the [SSEB] . . . , and [the SSA's] integrated assessment and comparison of the strengths, weaknesses, and risks of the proposals submitted in response to the solicitation." J.A. 2029.

Second, the SSA's analysis of the Corporate Experience/Capability subfactor considered the experience of both offerors. The very first paragraph of the SSA's analysis identified "UnitedHealth Group [as] the parent organization of [OPSS]," demonstrating the SSA's awareness of OPSS's organizational structure. J.A. 2039. Similarly, the SSA's summary of WellPoint's general corporate background acknowledged its parent company, Anthem. The SSA's analysis considered OPSS's affiliate, UnitedHealth Group, as having experience in pharmacy benefit management as "dat[ing] back to 1976," and credited WellPoint with the experience and capabilities of Anthem Pharmacy Solutions, which has been in operation "since 1989." J.A. 2039–40. The SSA also credited OPSS with the "30 years' experience managing . . . dental programs" of its affiliate, UnitedHealth Group, and WellPoint with the "significant dental network management record [of] 45 years" of its affiliate, DeCare. *Id.* The SSA also observed that "[a]ll three offerors have provided existing networks in the states comprising Region 3." J.A. 2041. Since WellPoint itself had no care network in Region 3, the SSA must necessarily have been contemplating the entire organization behind WellPoint, including its parents and affiliates.

The SSA concluded that "[OPSS] . . . and WellPoint each have prior experience managing large healthcare contracts; however, Optum's breadth, depth and diversity of its corporate experience will provide [the] VA with

guidance and expertise to fulfill its mission." J.A. 2040. The SSA's decision stated that "[OPSS]'s robust network and extensive corporate experience, . . . far exceed[ed] the other offerors," and that "[OPSS]'s demonstrated corporate experience represents a clear competitive advantage over . . . WellPoint." J.A. 2041.

Finally and most significantly, the SSA's award decision stated that:

> As the SSA, I recognize that this decision is to reflect[, as required by the FAR,] my own independent, integrated, and comparative assessment. In this role, I understand that I am free to agree or disagree, based upon my assessment of the findings, with the recommendation of the SSAC.

J.A. 2041 (emphasis added).

We conclude there has been no showing that the alleged errors in the TET were carried over to the SSA's decision. Therefore, the Claims Court did not err when it found that "the VA reasonably evaluated the responsive proposals under the Solicitation's Corporate Experience/Capability Subfactor." J.A. 19.

E

Even if the TET's error had been carried over to the SSA's decision, WellPoint has not demonstrated that the SSA's decision would have been different. As noted earlier, the Supreme Court explained in *Sanders* that the mere possibility of harm is insufficient to rise to the level of prejudicial error. We have held that the appropriate standard is that the bid protestor must allege a "significant error" that affected the award decision. *Alfa Laval*, 175 F.3d at 1368. WellPoint must show that "but for the error, it would have had a substantial chance of securing the contract." *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).

The Solicitation establishes that "[t]he non-price factors . . . , when combined, [were] significantly more important than [the] Price [factor]." J.A. 542. The other technical subfactors, "Network Management and Claims Adjudication" and "Management Approach," were "both individually . . . more importan[t] than [the Corporate Experience/Capability] subfactor." J.A. 541–42. The award decision shows that for the Network Management and Claims Adjudication subfactor, the SSA considered OPSS's "thorough approach and . . . readily available network, which targets the areas with the VA's greatest needs," to be "a clear competitive advantage over . . . WellPoint." J.A. 2038. For the Management Approach subfactor, the SSA noted that OPSS's proposal offered "several call centers in multiple locations" covering "all local time zones" within Region 3, while WellPoint's proposal offered "two geographically separated call centers." *Id.* The SSA found that OPSS's proposal "indicated significant experience in call center operations," while WellPoint's proposal indicated that it was prepared to "scale up availability." J.A. 2038–39. The SSA concluded that "although WellPoint provide[d] a viable proposal . . . there [were] no advantages that separate[d] it from [OPSS]." J.A. 2042.

In the circumstances of this case, WellPoint did not demonstrate that the Claims Court erred when it concluded that WellPoint would not would have had a "substantial chance" of winning the contract, even if the SSA's decision reflected the alleged error in the TET report, and even if WellPoint had been rated higher under the Corporate Experience/Capability subfactor.

Since WellPoint has not shown prejudice, there is no basis for setting aside the award based on the alleged unequal treatment.

CONCLUSION

WellPoint's challenges to the award were properly rejected by the Claims Court.

## AFFIRMED